United States *v.* M. J. Brandenstein & Co. (No. 3276 [1])

M. J. Brandenstein & Co. *v.* United States (No. 3277)

---

[1] T. D. 43941.

United States Court of Customs and Patent Appeals, March 19, 1930

*Charles D. Lawrence,* Assistant Attorney General (*John F. Kavanagh,* special attorney, of counsel), for the United States.

*Frank L. Lawrence (Martin T. Baldwin* of counsel) for Brandenstein & Co.

[Oral argument December 12, 1929, by Mr. Lawrence and Mr. Baldwin]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

These are cross-appeals from a judgment of the United States Customs Court.

Milled rice, consisting of both whole and broken grains, was assessed for duty by the collector at the port of San Francisco at 2 cents per pound under paragraph 727 of the Tariff Act of 1922, which reads as follows:

PAR. 727. Paddy or rough rice, 1 cent per pound; brown rice (hulls removed), 1¼ cents per pound; *milled rice (bran removed),* 2 cents per pound; *broken rice,* and rice meal, flour, polish, and bran, one-half of 1 cent per pound. [Italics ours.]

The importer objected to the collector's assessment, claiming that, while the whole grains of rice in the importation were properly assessed as milled rice at 2 cents per pound, the broken rice contained therein was properly dutiable as such at only one-half of 1 cent per pound under paragraph 727, *supra.*

On the trial below the importer introduced the testimony of two witnesses, James J. Sullivan and William Felix.

The witness, Sullivan, testified that he was a "licensed inspector" and the chief inspector of rice, wheat, corn, oats, and rye, for the Chamber of Commerce (of San Francisco, according to the brief of counsel for the importer); that he had held this position for a period of 6 years; that he had inspected rice for 20 years; that there are "two different grades of rice, the Hong Kong, China, and the Canton grades for foreign rice and then the U. S. Government grades of rice"; that milled rice is bought and sold according to grade; that, in order to determine the grade of a specific shipment of milled rice,

it is necessary to ascertain the quantity of broken rice, "moisture, seed, paddy, and foreign material" contained therein; that the percentage by weight of broken rice can easily and readily be ascertained by putting a quantity of rice "through a mixer or divider" for the purpose of securing a representative small sample—30 grams—and then segregating the broken grains from the whole grains by hand, or, as stated by the witness, by "hand picking it"; that this method of ascertaining the quantity of broken rice in a shipment of milled rice is prescribed by the Government; and that he applied the described test to the official sample marked "31416 K, 1000 mats rice" on the morning of the day he testified and found that the sample contained 88.4 per centum whole, 2.6 per centum "large broken," and 9 per centum "small broken" grains of rice.

The witness, Felix, said that by using the method employed by the witness, Sullivan, he found that the official sample marked "M" contained 89.9 per centum whole, 8.6 per centum "small broken," and 1.5 per centum "large broken" grains of rice; that the official sample marked "M-1" contained 89.4 per centum whole, 9.1 per centum "small broken," and 1.5 per centum "large broken" grains of rice; that the method employed by the witnesses for the importer to ascertain the relative quantities of broken and whole rice is the usual and standard method of grading rice; and that it is simple and accurate, and is prescribed by the Government for that purpose.

The witnesses, C. S. Morse, Abel P. Santos, and Daniel J. O'Leary, testified for the Government.

The witness, Morse, said that he had been employed in the rice business for about 33 years; that he bought and sold milled rice in wholesale quantities prior to and since the enactment of the Tariff Act of 1922, "On the coast, all over the United States"; that there are various grades of milled rice; that "all different grades are based principally upon the amount of broken rice contained in them, the trade designation being in domestic rice, fancy, extra fancy, choice, etc., based on the amount of broken rice it contained. In oriental rices they use the designation for grades of No. 1 and No. 2"; that the various grades of milled rice may contain broken rice in the following quantities: Extra fancy, 5 per centum; fancy, 10 per centum; choice, 20 per centum; No. 1 "Siam Garden," 5 per centum; No. 2 "Siam Garden," 10 per centum; and No. 1 "Pakling" rice from 5 to 10 per centum; and that the involved rice is "No. 1 Pakling." Thereupon the witness testified:

Q. These percentages that you give cover both—and large broken grains?—A. No, sir. The percentages I gave referred to the broken under certain sizes.

\* \* \* \* \* \* \*

Justice Brown. You mean that three-fourths of the rice has to be physically broken in order to be called broken rice?

The WITNESS. No, sir; a grain three-fourths size is not considered broken. Under three-fourths size—I think my testimony is conflicting there. Under three-fourths is a broken grain and three-fourths and over is considered a whole grain.

\* \* \* \* \* \* \*

Q. How would you grade a Pakling rice containing in the whole grains 89.9 per cent, large broken 1.5 per centum, and small broken 8.6 per centum?—A. Number 1 Pakling milled rice.

Q. Number 1 Pakling milled rice?—A. Of course, the trade does not use the word "milled" commonly. They leave that off. It is superfluous. It is understood when they are dealing in rices that they are milled rice.

Q. That is known as milled rice, though, isn't it?—A. Yes, sir.

He further said that the term "milled rice" did not have a trade meaning different from the common or dictionary meaning; that the term was used to indicate that rice had been through a milling process; and that the terms "milled" and "cleaned" have the same meaning and are used interchangeably in the trade. With reference to broken rice, the witness said:

Q. Is there any such commodity—do you know of any such commodity—as broken rice sold in the trade?—A. Yes, sir.

Q. What is that used for?—A. It is sold to the regular grocery trade.

Q. What is it?—A. It has the grains that are broken into small sizes, half sizes, or up to three-fourths sizes, and even the fine broken, which is in the trade termed "brewer's rice"; goes to brewers largely.

\* \* \* \* \* \* \*

Q. And the milled rice implies in the trade—it is known as whole grain, as well as broken grain, together?—A. Yes, sir; the grades are spoken of as having certain percentages of broken grains.

Q. That forms the different classes of broken rice?—A. Yes, sir.

Q. And upon that depends the price charged for the rice in the trade?—A. Yes, sir.

Q. Where there is less broken rice, why the price for that rice is higher; is that right?—A. That is correct.

The witness, Santos, testified that he had been buying and selling milled rice at wholesale since 1917, "On the Pacific coast, in the State of California and different sections of the country, in the United States"; that the term "milled rice" was understood in the trade to refer to rice that had been through "the milling process"; and that there are several grades of milled rice. In this connection he said: "In the domestic market we have fancy, extra fancy, choice, extra choice rices and in the oriental rices, which are generally consumed, Siam Garden, Nos. 1 and 2, Saigon Long No. 1 and No. 2." The witness further said that milled rice was understood, both commonly and commercially, to contain some broken rice; that rice which has the hull and the bran removed by a milling process is understood to be milled rice; that broken rice is milled rice—it has been through the milling process; and that milled rice is bought and sold

**484**

by grade terms, and the term "milled rice" is not commonly used in commercial transactions. With reference to broken rice, the witness said:

Q. Do you know of any commodity known as broken rice?—A. Yes, sir.

Q. And that is approximately what amount of rice that is broken?—A. It depends on different gradings.

Q. We will say, let us have the different gradings of broken rice commodities, known as broken rice?—A. You have your broken or your smaller sizes, your quarter sizes.

Q. But in all events 100 per centum of it is broken?—A. Well, 100 per centum would be too high a percentage. Say 98, 98½, and 99 per centum for practical purposes. It can be considered as entirely broken.

Cross-examination by Mr. BALDWIN:

Q. But at all events 100 per centum of it is broken?—A. Well, 100 per centum would be too high a percentage, say 98, 98½, or 99 per centum for practical purposes. It can be considered as entirely broken.

\*      \*      \*      \*      \*      \*      \*

Q. Among the grades of milled rice there is also the lowest grade of all, which is the broken rice; that is true, isn't it?—A. The broken rice.

Q. That is broken milled rice, is it?—A. Yes.

The witness, O'Leary, an examiner of merchandise at the port of San Francisco, said that he had never made any effort to ascertain the quantity of broken rice in an importation of milled rice; and that the percentage of broken rice in an importation of milled rice was not readily ascertainable by the customs authorities. With reference to the inspection and grading of milled rice, he said:

Q. These graders that Mr. Baldwin is talking about, what do you know about them? What did they do?—A. I understood that they are for the protection of the seller and the purchaser in establishing the grade of milled rice that the contract calls for.

Q. That is establishing the class to which they belong?—A. Yes.

\*      \*      \*      \*      \*      \*      \*

Q. What is the purpose?—A. To determine that the representations as to the grade of rice that are being sold and purchased, as represented by either No. 1 or No. 2, or No. 3, No. 1 taking the highest price, and No. 3 the lowest price.

The court below sustained the protest, holding that the quantity of broken rice in the importation was readily ascertainable by the customs officials; that 91 per centum of the imported rice was dutiable as milled rice at 2 cents per pound under paragraph 727, *supra*, as assessed by the collector, and that 9 per centum was dutiable as broken rice under the same paragraph at only one-half of 1 cent per pound.

Both parties appealed from the judgment below.

The importer contends that the trial court erred in holding that there was but 9 per centum broken rice, in view of the testimony of its witnesses that the importation was composed of not less than 10.1 per centum broken rice.

It is contended by the Government that "milled rice" is "deliberately prepared by the use of screens into grades carrying a percentage of broken rice grains, and when it is so prepared, it is commercial milled rice. It is not segregated for commercial purposes and should not be segregated for customs purposes"; that the quantity of broken rice in the importation was not readily ascertainable; that broken rice is worth less and is used for entirely different purposes; and that the term "broken rice" means rice inferior to "milled rice."

Counsel for the Government refers to the testimony of the witness, Morse, and emphasizes his statement that there is a commodity in the trade known as "broken rice," and "that 100 per centum broken rice went to brewers"; that the terms "cleaned rice" and "milled rice" had the same meaning in the trade; and that the Government had established that the involved rice was "known commercially as 'milled rice' and not as broken rice."

There is no evidence in the record that any applicable standards or grades of rice have been established, under the law, by any authorized department of the United States Government, and in what we may say hereinafter nothing shall be construed as an expression of our views if such a state of facts were established.

It is elementary in customs jurisprudence that, while tariff statutes are drafted in the language of trade and commerce, nevertheless, in the absence of evidence to the contrary, the commercial meaning of a tariff term is presumed to be the same as its common meaning. It is incumbent upon a party who asserts that a tariff term has a commercial meaning different from its common meaning to establish that fact by a preponderance of the evidence. Furthermore, if it is to control the classification of imported merchandise, such commercial meaning must be definite, uniform, and general, and not local, partial, or personal. These principles have been stated and restated by this court on many occasions, and we deem it unnecessary to cite authorities in support of them.

Paragraph 727 provides for rice in various forms and conditions. It provides for "milled rice (bran removed)" at one rate of duty, and for "broken rice" at a less rate of duty. Milled rice is rice that has been through a milling process for the removal of "bran." During this process some of the rice is broken. Obviously, the term "milled rice" is sufficiently broad to include *broken* milled rice. It appears from the record that the commercial grades of milled rice include *broken* rice in varying percentages—5 per centum in one grade, 10 per centum in another grade, and 20 per centum in the lowest grade. These grades of milled rice are known by various trade terms—"extra fancy, fancy, and choice" for domestic. rice, and "No. 1 Siam Garden, No. 2 Siam Garden, and No. 1 Pakling" for oriental rices, according to the testimony of the Government's witness,

Morse; and "fancy, extra fancy, choice, extra choice" for domestic rice, and "Siam Garden, Nos. 1 and 2, Saigon Long, Nos. 1 and 2,", for oriental rices, according to the witness, Santos, who also testified for the Government. (It will be observed that the trade witnesses were not in accord as to the trade terms for milled rice.) These trade terms are understood in the trade to refer to milled rice, but the term "milled rice" is not commonly used in commercial transactions.

Based upon the facts above stated, it is argued by counsel for the Government that, as broken rice is included in the enumerated grades of rice, such broken rice is dutiable as "milled rice." The Congress, however, has seen fit to distinguish between "milled rice" and "broken rice" for *tariff purposes*, and has provided for "milled rice" at 2 cents per pound, and for "broken rice" at only one-half of 1 cent per pound. Furthermore, the provision for broken rice is unlimited.

The word "broken" is commonly understood to mean "separated forcibly into parts." Obviously, then, broken rice, as commonly understood, means grains of rice that have been broken or separated into smaller parts.

It clearly appears from the testimony in the case that the common meaning of the term "milled rice" is the same as the commercial meaning, and that the common and commercial meaning is the same as the statutory definition. It is true that milled rice is bought and sold according to grade and is known by various grade terms (what those grade terms are, or exactly how many there are, can only be conjectured, as the trade witnesses did not agree), and that broken rice, in varying percentages, is included in these commercial grades of milled rice. However, it must be presumed that the Congress was informed of this situation when it enacted the paragraph in question. Accordingly, had there been any intention to distinguish between the broken rice provided for in the paragraph at one-half of 1 cent per pound and the broken rice contained in the various commercial grades of milled rice, it would have been a simple matter for the Congress to have said so.

The witness, Morse, said that broken grains of rice three-fourths or more of their original size were not considered broken rice in the trade. But he was not even asked if this trade meaning was definite, uniform, and general in the trade and commerce of the United States. Assuming, however, that such trade understanding had been established, it would seem to be perfectly clear that the broken grains of rice which were less than three-fourths of their original size (not less than 8.6 per centum of the importation) were broken rice.

The witness, Santos, said that there was a commodity bought and sold in the United States composed of from 98 to 99 per centum of *broken* rice. Assuming that this statement is true, what does it

prove? The witness also testified that milled rice sometimes contained as little as 3 per centum of broken rice.

Whether the Government called these witnesses for the purpose of proving that the term "broken rice" had a commercial meaning different from its common meaning does not clearly appear. In any event, they were not asked, and they did not say that the term "broken rice" had a commercial meaning different from its common meaning and that such trade meaning was definite, uniform, and general in the trade and commerce of the United States.

We may conclude our discussion of this feature of the case by saying that there is absolutely no evidence of commercial designation in the record. Therefore, in disposing of the issues, we are confined to the statutory meaning of the term "milled rice," which is the same as the common and commercial meaning, and to the common meaning of the term "broken rice."

The provision for broken rice in paragraph 193 of the Tariff Act of 1913 reads as follows:

* * * rice flour, and rice meal, *and rice broken which will pass through a number twelve sieve of a kind prescribed by the Secretary of the Treasury,* ¼ cent per pound; * * *. [Italics ours.]

Paragraph 240 of the Tariff Act of 1909 contained substantially the same provision.

It will be observed that paragraph 240 of the Tariff Act of 1909 and paragraph 193 of the Tariff Act of 1913 limited the provision for broken rice to such as would pass through a No. 12 sieve of a kind prescribed by the Secretary of the Treasury. No such limitation is contained in paragraph 727 of the Tariff Act of 1922, nor does the statute (paragraph 727) contain other language indicating that the Congress intended to place any arbitrary limitation on the provision for "broken rice." Accordingly, under the rule adopted by this court that a change of language in a tariff statute imports, generally, a change of legislative purpose, it would seem that the Congress intended that the provision for broken rice in paragraph 727, *supra,* should include all broken milled rice. *Tausend et al.* v. *United States,* 15 Ct. Cust. Appls. 323, T. D. 42490. This statement is subject to the qualification, however, that proof of commercial designation might greatly limit the meaning and application of the term "broken rice."

We have turned to the legislative history in an effort to ascertain, if possible, whether the Congress had some intention not made plain by the language of the statute. With the exception of the provisions of the Tariff Acts of 1909 and 1913, heretofore referred to, we have found nothing of value.

In the case of *Rice Millers' Association, etc.,* v. *United States et al.,* 15 Ct. Cust. Appls. 355, T. D. 42560, this court gave consideration

to the provisions for "broken rice" contained in paragraph 727, *supra*. The merchandise consisted of rice broken into half grains or smaller and a small percentage of whole grains. It was claimed by the protestants—American manufacturers—that the term broken rice contained in paragraph 727, *supra*, was intended to be limited to the cheaper grade of broken rice known as "brewer's rice." In holding that the statutory term "broken rice" was not intended to be so limited, the court, among other things, said:

> In this case paragraph 727 lays a duty of one-half of 1 cent per pound on broken rice, and the record discloses without contradiction that the importation described in the protest was broken rice. On what theory, therefore, can a rate of duty other than that provided for broken rice be lawfully applied to the product imported? On the theory, it is answered by appellant's counsel, that the designation "broken rice" meant to Congress brewer's rice, and, therefore, something different from what it meant to the trade and to people in general. That answer would be correct if it had been established that, *commercially*, broken rice was brewer's rice. The testimony, however, clearly proves that in trade and commerce the term "broken rice" is not limited to brewer's rice, and that, as it includes second head rice, screenings, and brewer's rice, it does not mean brewer's rice only.

If the term "broken rice" has a commercial meaning different from its common and ordinary meaning and if such commercial meaning is definite, uniform, and general in the trade and commerce of the United States and limits the term in question to rice consisting wholly or substantially wholly of broken grains, it was incumbent upon the Government in this case to prove such facts by a preponderance of the evidence. It did not do so. What the Government asks us to infer, it should have proved. Furthermore, if the term "broken rice" is limited in the trade to rice consisting wholly or substantially wholly of broken grains of rice, and, if the term "milled rice" includes as much as and no more than 20 per centum broken rice, it might be pertinent to inquire as to the tariff status of milled rice not included within either of those alleged commercial definitions. For example, what would be the tariff status of milled rice consisting of 25 per centum broken and 75 per centum whole grains of rice?

Considering the statute and its legislative history and the record before us, it would require reasoning "most fantastic" to hold "broken rice" dutiable as "milled rice."

It has been established by uncontradicted evidence that the involved merchandise consisted of at least 10.1 per centum broken rice. In view of the fact that the Congress has distinguished between "milled rice" and "broken rice" for tariff purposes, these tariff entities should have been classified accordingly, unless, having been commingled, the quantity or value of each was not readily ascertainable by the customs officers.

Section 507 of the Tariff Act of 1922 reads as follows:

SEC. 507. COMMINGLING OF GOODS.—Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

In the case of *United States* v. *Washburn-Crosby Co.*, 14 Ct. Cust. Appls. 243, T. D. 41874, this court construed section 507, *supra*, and, in giving application to its terms, held that "Where it was shown that simple and well-accredited tests determined the amounts of wheat and screenings in a mixed lot, such tests should have been accepted; and the *onus* of separation did not rest upon the importer." It is interesting to note that in the *Washburn-Crosby* case, *supra*, one witness found that the importation contained 2.3 per centum screenings, and the other witness found that the importation contained 2.7 per centum screenings. Surely, if screenings amounting to less than 3 per centum of an importation of mixed wheat and screenings are segregable for duty purposes, no plausible reason occurs to us why broken rice amounting to 10.1 per centum of an importation of mixed "milled rice" and "broken rice" should not be segregated for like purposes.

The test applied by the witnesses for determining the quantities of "milled rice" and "broken rice" in the case at bar, if we may rely upon the uncontradicted testimony, is not only prescribed by the Government, but is employed in the trade for that purpose and is simple and accurate. Accordingly, we are of opinion that the respective quantities of "milled rice" and "broken rice" in the importation in question were readily ascertainable by the customs officers.

It appears from the evidence that the importation consisted of at least 10.1 per centum broken rice.

The court below held that the collector should reliquidate on the basis of 9 per centum broken rice and 91 per centum milled rice. We have been unable to find any evidence in the record to support this finding.

We are of opinion that the importer is entitled to a finding that the importation consisted of 10.1 per centum broken rice and 89.9 per centum milled rice, and we so hold. The judgment is *modified* accordingly, and the cause *remanded* for proceedings consistent with the views herein expressed.

DISSENTING OPINION

BLAND, Judge: The collector classified the goods as "milled rice." The importer protested the classification and has not shown that it

is not "milled rice," but on the contrary concedes that it is "milled rice" and takes the position that since "milled rice" contains "broken rice" and "broken rice" is specially provided for, that the "broken rice" must be segregated from the importation for dutiable purposes. Notwithstanding the finding of the collector that this was "milled rice," the burden is thrown upon the Government to prove that it is the kind of "milled rice" referred to in the paragraph.

If the testimony in the case is to be regarded as not establishing a commercial meaning different from the common meaning of the words "milled" and "broken," it is, in my judgment, sufficient to justify our conclusion that "milled rice," as commonly understood, always contains some broken grains and ofttimes a very large quantity of same, and that "milled rice," commonly, is not a mixture of "milled rice" and "broken rice."

It is plain to me in view of the legislative history and the context of the paragraph that Congress knew that "milled rice" contained broken grains and that it never intended that a high-class rice like that at bar should be segregated and a portion of it called "broken rice," which is an entirely different commodity from "milled rice" and is used for different purposes. The action of the collector should have been *affirmed*.