**WINTER–WOLFF, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op.98–15.**
**Court No. 95–12–01712.**

United States Court of
International Trade.

Feb. 20, 1998.

Barnes, Richardson & Colburn, (James S. O'Kelly and Christopher E. Pey), for plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney–in–Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice; Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service (Beth C. Brotman), of counsel, for defendant.

### *OPINION*

GOLDBERG, Judge.

Plaintiff importer, Winter–Wolff, Inc., ("Winter–Wolff") challenges the United States Customs Service's ("Customs") classification of laser-treated aluminum capacitor foil imported from Switzerland in 1995.

In response to plaintiff's request for a ruling, the District Director at the port of Ogdensburg, New York, classified the laser-treated foil as aluminum foil, *not further worked,* under Harmonized Tariff Schedule of the United States ("HTSUS") subheading 7607.11.30, dutiable at a rate of 5.8% *ad valorem.* Plaintiff filed a timely protest of the ruling with Customs headquarters. Customs affirmed the District Director's ruling in HQ 958058, dated September 29, 1995.

Winter–Wolff then filed a timely appeal of Customs' decision, claiming the laser treatment constitutes "further working" and, as a result, the merchandise falls outside the ambit of HTSUS subheading 7607.11.30 and, instead, is properly classified under subheading 7607.19.60, dutiable at a rate of 3% *ad valorem.* Pursuant to 28 U.S.C. § 2640(a)(1) (1994), trial ensued on October 22 and 23, 1997. The Court exercises jurisdiction in this matter under 28 U.S.C. § 1581(a) (1994). The Court finds for plaintiff.

### I.

### *ISSUES PRESENTED*

Plaintiff claims the aluminum foil is "further worked" by the laser treatment and thus falls outside HTSUS subheading 7607.11.30, a tariff provision that requires applicable merchandise to be "not further worked." Instead, plaintiff contends the imports, as "further worked," are within the purview of HTSUS subheading 7607.19.60 and are properly dutiable at 3% *ad valorem.* Plaintiff maintains the common, dictionary meaning of the term "further worked" mandates this conclusion. To support this argument, plaintiff called three witnesses at trial: (1) Mr. Hans K. Sprunger, International Sales Manager for Lawson Mardon Neher AG ("Neher"), the producer of the laser-treated foil; (2) Mr. Daniel E. Weil, Manager of Winter–Wolff, Inc.; and (3) Mr. Herman Fletcher Jr., General Manager for Capacitor Products at Cooper Power Systems ("Cooper"), a capacitor manufacturer.

The government, on the other hand, asserts the meaning of the term "further worked" as defined in the commercial, metallurgical sense validates Customs' classification. As support for this argument, the government relies upon the testimony of one expert witness, Dr. Michael McNallan. Alternatively, the government submits that the laser treatment cuts the foil to shape such that the merchandise should be classified as capacitor foil that has been "cut-to-shape" under HTSUS subheading 7607.19.30, dutiable at a rate of 5.7% *ad valorem.*

This case boils down to one issue—whether the classification decision should be guided by the dictionary meaning or the commercial meaning of the tariff term "further worked." Resolution of this issue settles the following questions: (1) whether Customs correctly classified the imported foil under 7607.11.30, "Aluminum foil ... rolled but not further worked," or whether the laser treatment on

the imported merchandise constitutes "further working" within the meaning of Heading 7607, HTSUS?; and (2) whether, in the event the imported merchandise is found to have been "further worked," it has also been "cut to shape" such that it should be classified under subheading 7607.19.30 with a dutiable rate of 5.7% *ad valorem?*

## II.

### BACKGROUND

The merchandise at issue is aluminum foil for capacitors imported in rolls of widths of 228mm to 635mm, all of which are less than 0.01mm thick, that has been slit by a laser treatment. The laser-treated foil is produced in Switzerland by Neher. Manufacture of all aluminum capacitor foil, including the laser-treated variety at issue here, involves a multi-step process. First, foil stock is annealed, cooled, and rolled several times to reduce the thickness. Next, the foil stock is double rolled, *i.e.,* two layers of foil stock are rolled at the same time, to further reduce the thickness of the merchandise. The foil is then rewound and slit with mechanical knives to desired widths.

At this point, the capacitor foil may be sold, and is sold, without the laser treatment. Foil sold at this point is referred to as "hard" or "wet" (*i.e.,* foil with rolling oils) capacitor foil. If it is not sold at this stage, the foil is further annealed to remove certain oils and either sold or placed in inventory. From inventory, the foil is readied for sale in one of two manners: (1) as "soft" or "dry" capacitor foil, or (2) as laser-treated capacitor foil. If the foil is sold as "soft/dry" capacitor foil, the foil is simply removed from inventory and sold as is. The laser-treated foil, however, must undergo an additional process before shipment. Specifically, the foil is removed from inventory and passed beneath a laser. As the foil passes under the laser, the laser melts one of the foil's edges. The laser-treated side of the foil is distinguished by its rounded edge, which stands in contrast to the rough edges found on foil slit by knives. *See* Pl.'s Ex. 6. Importantly, while one edge of the foil passes under the laser, the other edge is simultaneously mechanically sheared by knives.

As its name suggests, capacitor foil is a type of aluminum foil dedicated for end use in capacitors. Capacitors are devices used by electrical utility companies to store electric energy. Capacitors may be found at substations for electrical utilities as well as on some overhead distribution lines. Electrical utilities use the capacitors to compensate for inherent deficiencies in A/C power lines. More specifically, when transferring electricity from a generator to a customer, power lines often introduce an inductive current that may cause voltages to drop. Capacitors, as electrical opposites, cancel out the inductive current in the lines and, hence, function as valuable components for electrical utilities.

Capacitors are manufactured using polypropylene film and aluminum capacitor foil. The film and foil are wound together in packs. Several of the packs are then placed in stainless steel tanks that are sealed, vacuum processed, and painted to make a capacitor. Two of plaintiff's witnesses, Mr. Sprunger and Mr. Fletcher, testified that the laser-treated foil is preferred by high-voltage capacitor manufacturers because the rounded edges, unlike the knife-slit edges, increase the discharge inception voltage ("DIV") performance of capacitors. Superior DIV performance is preferred by electrical utilities because it diminishes the possibility that the capacitor will experience a phenomena known as dielectric breakdown or "corona," the leading cause of capacitor failures.

## III.

### STANDARD OF REVIEW

The factual portion of a Customs' classification decision enjoys a statutory presumption of correctness; the importer plaintiff has the burden of proving otherwise. 28 U.S.C. § 2639(a)(1) (1994); *Anhydrides & Chems., Inc. v. United States,* —— Fed. Cir. (T) ——, ——, 130 F.3d 1481, 1485–86 (1997); *Goodman Mfg., L.P. v. United States,* —— Fed. Cir. (T) ——, ——, 69 F.3d 505, 508 (1995) (statutory presumption of correctness is limited to factual determinations). Pursuant to 28 U.S.C. § 2640(a), however, the legal basis for Customs' classification decision is subject

to *de novo* review. Indeed, the Court has a statutory duty when it reviews classification decisions to find the correct result. 28 U.S.C. § 2643(b); *Rollerblade, Inc. v. United States,* — Fed. Cir. (T) ——, ——, 112 F.3d 481, 484 (1997). In making this determination, the Court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). Because the parties do not dispute Customs' factual findings here, the presumption of correctness is not relevant. This case is reviewed *de novo.*

## IV.

### DISCUSSION

■ This case requires the Court to determine the correct meaning of the term "further worked" as it appears in HTSUS subheading 7607.11.30. "[T]he meaning of a tariff term is a question of law." *Brookside Veneers, Ltd. v. United States,* 6 Fed. Cir. (T) 121, 124, 847 F.2d 786, 788 (1988). It is fundamental that a court should determine the correct classification of a tariff term by first turning to the terms of the statute, *i.e.,* the HTSUS, and its legislative history, *i.e.,* the relevant Chapter and Section Notes. *See, e.g., Lynteq, Inc. v. United States,* — Fed. Cir. (T) ——, ——, 976 F.2d 693, 696 (1992) (citations omitted); *see also* GRI 1, HTSUS (providing that "classification shall be determined according to the terms of the headings and any relative section or chapter notes...."). When, however, a tariff term is not clearly defined by the statute or its legislative history, it is also fundamental that the correct meaning of the tariff term is "presumed to be the same as its common or dictionary meaning in the absence of evidence to the contrary." *Rohm & Haas Co. v. United States,* 2 Fed. Cir. (T) 28, 29, 727 F.2d 1095, 1097 (1984) (quoting *Bentkamp v. United States,* 40 C.C.P.A. 70, 78 (1952) (ci-

tation omitted)). *See also Mita Copystar America v. United States,* — Fed. Cir. (T) ——, ——, 21 F.3d 1079, 1082 (1994); *Brookside Veneers,* 6 Fed. Cir. (T) at 125, 847 F.2d at 789 (citation omitted).

■ In ascertaining the meaning of a tariff term, it is also presumed that the commercial meaning of the term is the same as its common meaning. *Motor Wheel Corp. v. United States,* 19 CIT 385, 388 (1995) (citing *Nippon Kogaku (USA), Inc. v. United States,* 69 C.C.P.A. 89, 92, 673 F.2d 380, 382 (1982)); *Daniel Green Shoe Co. v. United States,* 58 Cust. Ct. 7, 14, 262 F.Supp. 375, 380 (1967) (citing *United States v. M.J. Brandenstein & Co.,* 17 C.C.P.A. 480, 485 (1930); *Hummel Chem. Co. v. United States,* 29 C.C.P.A. 178, 183 (1941)). Yet, in those instances where the common and commercial meanings differ, the party who argues that the term "should not be given its common or dictionary meaning must prove that there is a different commercial meaning in existence which is definite, uniform, and general throughout the trade." *Rohm & Haas,* 2 Fed. Cir. (T) at 29, 727 F.2d at 1097 (quoting *Moscahlades Bros. v. United States,* 42 C.C.P.A. 78, 82 (1954) (internal quotations omitted)). *See also Central Prods. Co. v. United States,* 20 CIT ——, ——, 936 F.Supp. 1002, 1004 (1996) (citations omitted); *S.G.B. Steel Scaffolding & Shoring Co. v. United States,* 82 Cust. Ct. 197, 206 (1979) (citations omitted). For the party carrying the burden, "[p]roof of commercial designation is a question of fact to be established in each case." *Rohm & Haas,* 2 Fed. Cir. (T) at 29, 727 F.2d at 1097 (quoting *S.G.B. Steel,* 82 Cust. Ct. at 206 (and cases cited therein)).

In view of the foregoing principles, the framework for analysis in this case is set. Since neither the language of tariff heading 7607 nor the Chapter or Section Notes define "further worked," the Court must look elsewhere to discern its meaning.[1] The parties

---

1. Both parties suggest that the Court look to the Explanatory Note to HTSUS subheading 7607.11 to find the meaning of the term "further worked." The Explanatory Note at issue lists the following processes as "not further worked" within the meaning of subheading 7607.11: cold-rolling, hot-rolling, heat treatments, separation,

chemical cleaning or washing, and trimming, slitting, or cutting into rectangular shapes. WinterWolff argues that since the laser treatment is not specifically listed as one that constitutes "not further worked," the laser-treatment *a fortiori* amounts to "working." *See Pl.'s Pre–Trial Mem.,* at 11–12. On the other hand, the government

advance "common meanings" of the term "further worked," but one reflects the "dictionary" meaning while the other purportedly reflects the "commercial" meaning. In essence then, this is a case where the presumption that the commercial and common meaning of the term are the same does not hold. Here, the proffered commercial meaning differs from the common, dictionary meaning of the term. Accordingly, the Court must consider if the proffered commercial meaning is "definite, uniform, and general" throughout the trade. *See Rohm & Haas, supra.*

Defendant, as the party attempting to establish the commercial meaning in this case, has the burden of proof. If defendant satisfies its burden, the Court will assess whether the laser treatment constitutes "further working" within the commercial meaning. If, however, the Court finds defendant fails to satisfy its burden, the Court must identify the appropriate common, dictionary meaning of the term and then must consider whether the laser treatment meets the term's common or dictionary meaning. Finally, if the Court deems the merchandise "further worked" within either the commercial or dictionary meaning, the Court must consider defendant's alternative classification argu-

ment; that is, whether the merchandise is "cut-to-shape" by the laser treatment.

Following this framework, the Court concludes that defendant has not satisfied its burden. It has not established that a general, uniform "commercial" meaning of the term "further worked" exists that should be used in this case. Instead, the Court holds that the term should be defined in accord with its common, dictionary meaning for purposes of HTSUS subheading 7607.11, and that plaintiff's merchandise is "further worked" within this meaning. Finally, the Court concludes the merchandise at issue has not been "cut-to-shape" and, thus, finds defendant's alternative classification argument unpersuasive.

## A.

■ Defendant defines "further worked" in the context of HTSUS subheading 7607.11.30 as the "mechanical deformation of a product in the solid state after the fabrication of the original product." *Def.'s Pre–Trial Mem.*, at 11. *See also Depo. Test. of Dr. McNallan* (May 20, 1997) ("*McNallan Depo.*"), at 77; Trial Test. of Dr. McNallan. Defendant maintains this is the metallurgical, or more precisely stated, the commercial meaning of the term "further worked."[2] On

---

argues that the laser treatment constitutes a more advanced form of one of the processes listed in the Note, and that tariff terms are meant to incorporate product advancements. *See Def.'s Pre–Trial Mem.*, at 23.

The Court declines to take guidance from the Explanatory Note to HTSUS subheading 7607.11. First, although they may be used to clarify the scope of terms, it is well established that Explanatory Notes, unlike Chapter or Section Notes, are neither dispositive nor controlling legislative history. *See, e.g., Midwest of Cannon Falls, Inc. v. United States*, —— Fed. Cir. (T) ——, ——, 122 F.3d 1423, 1428 (1997) (citation omitted); *Mita Copystar*, —— Fed. Cir. (T) at ——, 21 F.3d at 1082 (citation omitted). More importantly, it is also well established that an Explanatory Note acts only as a guide when the term at issue is specifically included or excluded from the Note. *See, e.g., H.I.M./Fathom, Inc. v. United States*, 21 CIT ——, ——, 981 F.Supp. 610, 613 (1997) ("[T]he Explanatory Notes are persuasive authority for the Court when they specifically include or exclude an item from a tariff heading.") (citation omitted). This is not the case here; the ambiguity as to whether the Note includes or excludes the laser treatment is appar-

ent. Consequently, no guidance is derived from this source.

**2.** Although far from clear, it appears that defendant would like the Court simply to view its proposed definition as any other technical or scientific reference, references that are often used to assist the court in ascertaining the "common" meaning of a term. *See, e.g., Brookside Veneers*, 6 Fed. Cir. (T) at 125–26, 847 F.2d at 789–90. In fact, however, defendant asks much more of the Court. Defendant urges the Court to adopt a meaning of the term "further worked" that it describes in various places as the "ordinary commercial, metallurgical understanding"; "the meaning [] the term ... has with respect to metals in general, and aluminum, in particular"; and the meaning of the term in the "metallurgical sense as it is understood in the aluminum industry." *Def.'s Reply Pre–Trial Mem.*, at 6; *Id.* at 3; *Def.'s Pre–Trial Mem.*, at 11, 15.

The Court cannot blind itself to the fact that defendant seeks application of a definition that can only be described as the commercial designation of that term. The "commercial designation" of a term refers to the interpretation commonly placed upon it by the particular industry. *See S.G.B. Steel*, 82 Cust. Ct. at 204–05. Without

the other hand, *Webster's Ninth New Collegiate Dictionary* defines "further" and "worked" as:

> **further** ... 1. Farther ... 2. in addition: Moreover 3. to a greater degree or extent. ...

> **worked** ... that has been subjected to some process of development, treatment, or manufacture.

*Webster's Ninth New Collegiate Dictionary* 500, 1359 (1983). Thus, the dictionary meaning for the term "further worked" amounts to the following: to subject an existing product to some process of development, treatment, or manufacture to a greater degree or extent. There is a plain conflict between the dictionary and purported commercial meaning of the term.

As discussed earlier, when the common and commercial meaning of a term differ, the party advocating the commercial meaning has the burden of proving its definition is "definite, uniform, and general throughout the trade." *See Rohm & Haas, supra.* Thus, the defendant must prove that for purposes of HTSUS subheading 7607.11.30, the Court should adopt the metallurgical or commercial meaning of the term that it favors.

Defendant fails to meet its burden. The government's expert witness,[3] Dr. McNallan, testified on direct that the government's favored definition is widely accepted in the metallurgical field. The evidence belies this claim. For example, Dr. McNallan noted at trial that he regards the technical sources cited in the government's pre-trial memorandum as authoritative in the metallurgical field and in the aluminum foil industry. These sources included the following: (1) *Rolling Aluminum: From the Mine Through the Mill,* The Aluminum Ass'n., 1990; (2) *Aluminum Properties and Physical Metallurgy,* American Soc'y for Metals (John Hatch ed., 1984); (3) J Temple Black & Ronald A. Kosher, *Materials and Processes in Manufacturing,* (6th ed.1984); (4) G. Sachs, *Fundamentals of the Working of Metals* (1954); (5) Joe Lawrence Morris, *Modern Manufacturing Processes* (1955); and (6) Norman E. Dowling, *Mechanical Behavior of Materials* (1993). Significantly, not one of the six sources cited by the government as support, and qualified by Dr. McNallan as authoritative, even hints that the definition of "work" is limited solely to deformation of the *"mechanical"* variety. For instance, the glossary to *Rolling Aluminum* defines "work" as follows: "[i]n metallurgy, to deform metal sufficiently to alter its metallurgical structure, and consequently its mechanical properties." *Id.* at Glossary, 9–5. Similarly, *Materials and Processes in Manufacturing* defines hot and cold working, in part, as the "plastic deformation of metals. ..." *Id.* § 13, at 331, 334. As with the other references cited by the government, neither source incorporates the qualifier "mechanical" to describe the deformation that must occur to be considered "worked"

---

doubt, defendant here asks the Court to adopt the "commercial designation" of the term "further worked."

**3.** Winter–Wolff objected to Dr. McNallan's certification as an expert on the effect(s) of the laser treatment. Dr. McNallan is a Professor of Materials Sciences at the University of Illinois at Chicago; has served on the faculty of the Metallurgical program there since 1978; earned his Ph.D. in Metallurgy from MIT in 1977; and has taught and supervised research on many aspects of metallurgy and materials processing technology. Under FRE R. 702 a witness qualified by "knowledge, skill, experience, training, or education" will be allowed to testify as an expert if the testimony "will assist the trier of fact. ..." This court has recognized in the past that when dealing with metallurgical provisions, the testimony of metallurgists may be particularly helpful. *See W.R. Filbin & Co. v. United States,* 63 Cust. Ct. 200, 205–04, 63 Cust.Ct. 200, 306 F.Supp. 440, 443–44 (1969).

Here, Dr. McNallan plainly has expertise in the fields of metallurgy and materials processing. The testimony of Dr. McNallan, while perhaps founded on expertise more general than the topics at issue in this trial, helped to illuminate the meaning of the term "further working" in a metallurgical context. For this reason, the Court allowed Dr. McNallan to testify as an expert in this trial. Winter–Wolff's objections went to the ultimate questions in this case; that is, the objections went to the weight that should be accorded Dr. McNallan's testimony, not to the admissibility of the testimony. *See Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 283 (8th Cir.1995) ("[C]hallenges to the expert's skill or knowledge go to the weight to be accorded to the expert testimony rather than to its admissibility.") (internal quotations and citations omitted).

in either the metallurgical field or the aluminum foil industry. Also, further refinement of the definition through the addition of "in the solid state" is wholly lacking from the cited metallurgical and aluminum industry technical sources. The contradictions with authoritative sources from the metallurgical field and the aluminum foil industry alone suffice to show that defendant's proposed commercial definition is far from uniform or definite (either in the metallurgical field, in general, or the aluminum foil industry, in particular).

Moreover, the definition offered by defendant and Dr. McNallan conflicts with the term "further worked" as described in other portions of the tariff schedule. For instance, Additional U.S. Note 2 to Chapter 72 of the HTSUS classifies the following processes as "further worked":

> [A]ny of the following surface treatments: polishing and burnishing; artificial oxidization; chemical surface treatments such as phosphatizing, oxalating and borating; coating with metal; coating with nonmetallic substances (e.g., enameling, varnishing, lacquering, painting, coating with plastic materials); or cladding.

Additional U.S. Note 2 to Chapter 72. On cross-examination and in his deposition testimony, Dr. McNallan conceded that most of these processes fail to satisfy his definition of the term "further worked." *See McNallan Depo.*, at 76–80; Trial Test. of Dr. McNallan. The Court is aware that Congress has expressly stated the terms of the Note apply only for purposes of Chapter 72, the iron and steel chapter of the tariff schedule. *See* Additional U.S. Note 2 to Chapter 72. Yet, the Court finds instructive Dr. McNallan's outright rejection of the definition Congress supplied for "further worked," albeit one supplied in the context of another metallurgical provision. The conflict between Dr. McNallan's testimony and the language in Note 2 obviously is not dispositive of whether the government's definition should be used for purposes of subheading 7607.11. Nevertheless, it diminishes the weight that the Court might otherwise assign to Dr. McNallan's testimony in determining if the government's

definition actually represents a definite, uniform commercial meaning of the term.

Finally, the purported commercial nature of the government's definition is further undermined by Dr. McNallan's own testimony. It is true that the Court certified Dr. McNallan as an expert, and it is evident that Dr. McNallan is well qualified in the field of metallurgy in general. On cross-examination, however, Dr. McNallan testified that he does not consider himself an expert in the field of aluminum foil manufacturing or in capacitor manufacturing. Nor has Dr. McNallan published an article, taught a course, or consulted on aluminum foil production, capacitor production, or the use of lasers in capacitor foil production. For these reasons, the Court declines to give substantial weight to Dr. McNallan's testimony as to what might be the uniform, definite commercial meaning for the term "further working" in the aluminum capacitor foil industry.

As aptly described in *Bar Zel Expediters, Inc. v. United States*, 3 CIT 84, 544 F.Supp. 868 (1982), *aff'd*, 1 Fed. Cir. (T) 17, 698 F.2d 1210 (1983), "it is not sufficient merely to show that the merchandise does not fall within an undefined commercial meaning different from the common meaning." 3 CIT at 89, 544 F.Supp. at 872 (citations omitted). In *Bar Zel*, the party advocating the commercial meaning introduced witnesses at trial who testified that the merchandise at issue was not known as "clasps" or "sew-on fasteners" in the commercial sense. Yet, the *Bar Zel* court correctly pointed out that while this testimony could be true, it missed the mark. According to the *Bar Zel* court, the evidence of record was insufficient to establish that a commercial designation for "clasps" or "sew-on fasteners" existed that was definite and uniform throughout the trade. 3 CIT at 89–90, 544 F.Supp. at 872–73. Similarly here, defendant's evidence purports to show that the laser-treated foil is not "further worked" within the meaning of the commercial definition it advocates. Yet, the thrust of this evidence also misses its mark. Most importantly, defendant's evidence is inconclusive as to whether the commercial meaning of the term it advocates is definite and uniform throughout the metallurgical field, in general, and the aluminum foil industry, in particular.

It is fundamental that a commercial designation cannot be established where there is a conflict as to its meaning. *See, e.g., S.G.B. Steel*, 82 Cust. Ct. at 209 (citations omitted). When viewed against authoritative sources and other references, defendant's and Dr. McNallan's definition is replete with contradictions and plainly lacks uniformity. With acute clarity, the record evidence demonstrates that defendant failed to establish that there is a definite and uniform commercial definition that can be ascribed to the term "further worked." The Court, therefore, is unpersuaded that the commercial designation advanced by defendant represents the appropriate meaning of the term "further worked" for purposes of HTSUS subheading 7607.11.

### B.

■ In the absence of a special commercial designation, the language of a tariff term is to be construed in accordance with its common, dictionary meaning. *See, e.g., Central Prod. Co., supra.* As noted earlier, the definitions of "further" and "worked" in *Webster's Ninth New Collegiate Dictionary* amount to the following: to subject an existing product to some process of development, treatment, or manufacture to a greater degree or extent. Similarly, the *Oxford English Dictionary* defines "further" and "work" as follows:

> **further** [ ], *adv.,* ... 1. To or at a more advanced point of progress: ... 2. To a greater extent; more.
> **work** ... 3. To produce by (or as by) labour or exertion; to make, construct, manufacture; to form, fashion, shape.

6 *Oxford English Dictionary* 285 (2d ed.1989); 20 *Oxford English Dictionary* at 541.

When cobbled together, this dictionary meaning amounts to the following: to form, fashion, or shape an existing product to a greater extent. At first blush the melded dictionary meanings may appear too general for purposes of assigning meaning to a tariff term. However, after considering the other technical sources and the record evidence discussed below, the Court is convinced the term "further worked" for purposes of HTSUS subheading 7607.11 should be defined in accordance with its dictionary meaning. Of course, the Court still must determine whether the laser treatment constitutes "further working" in accordance with its common, dictionary meaning.

■ The Court is satisfied that it does. First, evidence adduced at trial demonstrates that the laser treatment is performed on merchandise that already exists as a commercial product and, hence, the process constitutes "further" working. Specifically, Mr. Sprunger testified at trial that a commercial product exists after the aluminum foil is hard slit and before it is placed in inventory. As support, Mr. Sprunger testified that the hard-slit foil is slit to the gauge and width required by customers, and he testified that a major customer in the United States purchases the hard-slit foil. Importantly, Dr. McNallan, on cross-examination, also confirmed that a commercial product exists after the foil has been hard slit and before it has been placed in inventory. In addition, testimony from various witnesses at trial, including Mr. Sprunger and Mr. Fletcher, demonstrated that the laser treatment added substantial value to the existing commercial product, indeed somewhere between 20% and 30%, a fact that leads the Court to believe some "further" process indeed occurred. Finally, Dr. McNallan conceded that even in his view the laser treatment amounted to "*further* processing," as distinguished from "further working." For the above reasons, the Court finds that the laser treatment constitutes at least a "further" process within the dictionary meaning of the term.

Significantly too, the evidence of record demonstrates that the laser treatment constitutes "working" within the common meaning of that term. Mr. Sprunger testified that the purpose of the laser treatment is to improve the edge of the foil and, in doing so, to offer capacitor manufacturers a better product. The laser-slit foil is deemed improved because the laser effectively rounds an edge of the aluminum capacitor foil. *See* Pl.'s Ex. 6 (This exhibit, accepted into evidence at trial, dramatically illustrates the differences between the edges of the product that has been subjected to the laser treatment and the

edges of foil that have been slit by knives.). According to plaintiff's witnesses, Mr. Sprunger and Mr. Fletcher, this effect is important because the edges of standard capacitor foil have "burrs" caused by the knife-slitting process. As Mr. Fletcher testified, the burrs are anathema to capacitor manufacturers because they adversely affect DIV performance and, in turn, increase the likelihood that dielectric breakdown may occur in the capacitor. The rounded edges, on the other hand, enhance DIV performance and, thus, are preferred by capacitor manufacturers and, ultimately, electrical utilities. *See* Pl.'s Ex. 5 (This exhibit, accepted into evidence at trial, is a brochure from Cooper explaining the benefits for electrical utilities that result from the rounded, laser-treated edges). Importantly, Mr. Sprunger testified that, to his knowledge, Neher is the only capacitor foil manufacturer that employs the laser treatment. Mr. Sprunger also testified that the enhanced value of the laser-treated product is evidenced by the customers' willingness to pay "substantially more" for the laser-treated product—a fact supported by Mr. Fletcher's testimony that Cooper is willing to pay 20% to 30% more to obtain the laser-treated foil. Also, the record evidence established that the only method to achieve the rounded edge deemed so valuable by the capacitor manufacturer and, in turn, the electrical utility companies, is through the laser process. *See* Trial Test. of Mr. Sprunger.

Furthermore, on cross-examination, Dr. McNallan even testified that the laser treatment "deformed" the edge of the foil. Referring back to the authoritative metallurgical and aluminum industry sources cited by the government, it is apparent that "deformation" is a critical component of "working." For example, *Rolling Aluminum* defines "work" as "to deform metal sufficiently to

alter its metallurgical structure...." *Id.* at Glossary, 9–5. Similarly, in describing the process of "working," *Aluminum Properties and Physical Metallurgy* states "[t]he deformation of aluminum and its alloys proceeds by normal crystallographic slip processes." *Id.* § 4, at 105. Since the Court finds reference to the technical sources instructive, Dr. McNallan's admission that the laser "deforms" the edge leads the Court to believe that the treatment at issue constitutes "working" even when measured against technical references. From this review, the Court is convinced that the physical effects [4] produced by the laser amount to a process, treatment, or development. Hence, the laser treatment constitutes "working" within the common, dictionary meaning of the term.

Therefore, the Court finds that the laser treatment constitutes both a "working" and a "further" working within the common, dictionary meaning of these terms. For this reason, the Court holds that Customs incorrectly classified the imported merchandise under HTSUS subheading 7606.11.30, as aluminum capacitor foil, *not further worked.*

■ As discussed previously, the Court has found that the metallurgical, commercial meaning of the term "further worked" as proposed by defendant is not uniform and, hence, inapplicable for classification purposes. The Court nevertheless notes that even were it to adopt this more restrictive definition, it would still find that the laser treatment meets the rigors of the government's definition. Specifically, Dr. McNallan testified that the knife slitting would constitute "further" processing as well as "further" working" within the meaning of the definition espoused by defendant because mechanical deformation occurs at the edge of the foil. Dr. McNallan then testified that the laser treatment amounted to further processing,

---

4. At trial, much ado was made about whether the laser treatment also caused an increase in the oxide layer on the foil and, thus, imparted an additional effect. To the Court, this was much ado about nothing. Apparently, an enhanced oxide layer might be beneficial for capacitor manufacturers because it acts as an "insulator." Mr. Sprunger, Mr. Fletcher, and Dr. McNallan all testified that an added oxide layer is, or likely is, produced by the laser treatment. Though not taken for the truth of the matter, the patent for the laser treatment also notes that an enhanced oxide layer forms on the surface of the foil. *See* Pl.'s Ex. 4 (U.S. Patent No. 4,916,285). Yet, defendant correctly pointed out at trial that there is no documentary evidence of this supposed effect. The Court need not resolve this factual dispute to reach a decision. The rounded edges and deformation that ensues from the laser treatment suffice to convince the Court that the treatment constitutes "working."

and that the laser even deformed the edge of the foil. Yet, in his view it did not constitute further working solely because there was no *mechanical* deformation involved.

This view is contradicted by the facts of the case. The laser treatment simply constitutes a more advanced, refined method of "mechanical" slitting. Indeed, there are mechanical components to the laser treatment. Most notably, the foil is mechanically pulled under the laser, and the edge that is not subjected to the laser treatment is simultaneously sheared mechanically by knives. Also, the notion that a laser performs a nonmechanical function while a knife performs a mechanical function, is nonsensical and purely semantic. In the Court's view, this evidence would also be sufficient to conclude that actual *mechanical* deformation occurs as a result of the laser treatment. Hence, the treatment would constitute "further working" even within the strictures of the government's purported commercial definition.

### C.

■ Finally, the government maintains that if the Court finds that Customs' erred in classifying the merchandise as "not further worked," the foil is still "cut-to-shape" by the laser such that the merchandise should be classified under HTSUS subheading 7607.19.30 (dutiable at 5.7% *ad valorem* ) rather than under subheading 7607.19.60 (dutiable at 3% *ad valorem* ). Specifically, the government contends the laser rounds the edges of the capacitor foil such that it must be considered foil that has been "cut-to-shape." *See Def.'s Pre–Trial Mem.*, at 26.

The Court finds this argument without merit. At trial, plaintiff introduced samples of "die-cuts" for yogurt tops as examples of "cut-to-shape" foil. *See* Pl.'s Ex. 18. Defendant argued that because the samples surely could not be exhaustive of all types of cut-to-shape foil, they should be disregarded. The Court agrees in part. It is true that the samples may not be exhaustive of all types of cut-to-shape foil. Nevertheless, the samples still dramatically demonstrate that the imported merchandise has not been cut to shape. More concretely, the laser-treated foil is imported in rolls over three miles long.

*See* Trial Test. of Mr. Fletcher. Also, Mr. Fletcher testified that Cooper, the capacitor manufacturer, cuts the foil over 150 times after receiving the merchandise. The laser-treated foil is markedly different, indeed not remotely similar, to the "die-cuts" that have plainly been cut to shape. It would be an absurd result if the Court were to find that merchandise imported in rolls over three-miles long and then cut upwards of one hundred times is "cut-to-shape" prior to importation. If the Court were to accept this result, effectively all capacitor foil that has been slit then might be considered "cut-to-shape." The statute, as evidenced by the subheadings to Chapter 76 of the HTSUS, plainly illustrates this is not an outcome contemplated by Congress.

Therefore, the Court finds that HTSUS subheading 7607.19.30 does not present an acceptable alternative classification for the imported merchandise at issue.

### V.

### *CONCLUSION*

For the foregoing reasons, the Court finds that Customs incorrectly classified the merchandise under HTSUS subheading 7607.11.30, rather than under subheading 7607.19.60 with a dutiable value of 3% *ad valorem.* Customs' classification decision is reversed and judgment will be entered accordingly.

### JUDGEMENT

This case having been heard at trial and submitted for decision, and the court, after consideration of all papers and herein, and upon due deliberation, having rendered a decision, it is hereby

**ORDERED, ADJUDGED,** and **DE-CREED:** that the classification of the subject merchandise by the United States Customs Service ("Customs") under subheading 7607.11.30 of the Harmonized Tariff Schedule of the United States ("HTSUS") is reversed; and it is further

**ORDERED, ADJUDGED,** and **DE-CREED:** that Customs shall reliquidate the subject merchandise under subheading 7607.19.60 of the HTSUS, dutiable at a rate of 3 percent *ad valorem.* Customs shall refund excess duties paid with interest as pro-vided by law. Judgement is hereby entered for plaintiff.

**SO ORDERED.**