60 F.3d 778
 17 ITRD 1417
 ERICSSON GE MOBILE COMMUNICATIONS, INC., and Murata
Manufacturing Co., Ltd. and Murata Erie North America, Inc.,
and Matsushita Electric Corp. of America and Matsushita
Communications Industrial Corp. of America, and OKI Electric
Industry Co., Ltd., and Mitsubishi Electric Corp. and
Mitsubishi Consumer Electronics America, Inc., and TDK Corp.
and TDK Corp. of America, Plaintiffs-Appellees,
v.
The UNITED STATES, Defendant,
and
Motorola, Inc., Defendant-Appellant.
 No. 94-1366.
 United States Court of Appeals,
Federal Circuit.
 June 27, 1995.
As Amended Sept. 1, 1995.
 
 Jeffrey L. Kessler, Weil, Gotshal & Manges, New York City, and Michael T. Shor, Arnold & Porter, Washington, DC, argued, for plaintiffs-appellees. With Shor on the brief were Richard A. Johnson and Susan Morita. Also on the brief were Gail T. Cumins, Sharetts, Paley, Carter & Blauvelt, P.C., New York City, for plaintiffs-appellees, Ericsson GE Mobile Communications, Inc., Ronald I. Meltzer, Wilmer, Cutler & Pickering, Washington, DC, for plaintiffs-appellees, OKI Electric Industry Co., Ltd., Benjamin Thomas Peel, III, Baker & McKenzie, Washington, DC, for plaintiffs-appellees, Mitsubishi Electric Corp. and Mitsubishi Consumer Electronics America, Inc., Robert F. Seely, Mark S. Zolno, Katten, Muchin & Zavis, Chicago, IL, for plaintiffs-appellees, TDK Corp. and TDK Corp. of America. Robert C. Cassidy, Jr., Wilmer, Cutler & Pickering, Washington, DC, for OKI Electric Industry Co., Ltd.
 Harvey M. Applebaum, Covington & Burling, Washington, DC, argued, for defendant-appellant. With him on the brief were David R. Grace and Mark F. Kightlinger. Also on the brief was Timothy A. Harr, Motorola, Inc., Washington, DC. A. David Lafer and David M. Cohen, Dept. of Justice, Washington, DC, for defendant, U.S.
 Before ARCHER, Chief Judge, LOURIE and BRYSON, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 The issue in this case is a narrow one: whether the Commerce Department properly interpreted and applied one of its antidumping duty orders to a particular set of products. At the request of an importer of electronic components, the Commerce Department in 1991 reviewed 11 of the importer's products to determine whether they were within the scope of a 1985 antidumping duty order covering cellular mobile telephones and subassemblies. The Department found that all 11 products were within the scope of the 1985 order. On review, the Court of International Trade refused to sustain the Commerce Department's interpretation of the antidumping duty order. The court further held that, under a proper interpretation of the order, none of the 11 products was subject to an antidumping duty. Ericsson GE Mobile Communications, Inc. v. United States, 825 F.Supp. 1085 (Ct.Int'l Trade 1993) (Ericsson I ); Ericsson GE Mobile Communications, Inc. v. United States, 850 F.Supp. 34 (Ct.Int'l Trade 1994) (Ericsson II ).
 
 
 2
 We agree with the Court of International Trade that the Commerce Department's 1991 scope determination impermissibly expanded the 1985 antidumping duty order. The court therefore properly vacated the 1991 scope determination. We agree with the appellant, however, that the Court of International Trade should not have made a final determination that the 11 products at issue were outside the scope of the antidumping duty order. We therefore affirm in part, vacate in part, and remand for further consideration and prompt resolution of this much-delayed matter.
 
 
 3
 * The proceedings that led to this case began almost 11 years ago, when Motorola, Inc., the largest American manufacturer of cellular mobile telephones (CMTs), petitioned the Department of Commerce to initiate an antidumping duty investigation with regard to CMTs made in Japan. See 19 U.S.C. Sec. 1673a. Investigations by the Department's International Trade Administration and by the International Trade Commission resulted in findings that CMTs and CMT subassemblies from Japan were being sold in the United States at less than fair value, and that the sales of those products were materially injuring a United States industry. See 19 U.S.C. Sec. 1673d; Cellular Mobile Telephones and Subassemblies From Japan, 50 Fed.Reg. 45,447 (1985); Cellular Mobile Telephones and Subassemblies From Japan, Determination of the International Trade Comm'n in Investigation No. 731-TA-207 (Final) Under the Tariff Act of 1930 (Dec. 9, 1985). Accordingly, in December 1985 the Commerce Department issued an antidumping duty order, which encompassed CMTs, CMT transceivers, CMT control units, and certain subassemblies of those products. See 19 U.S.C. Sec. 1673e; Anti-Dumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan, 50 Fed.Reg. 51,724 (1985).
 
 
 4
 The antidumping duty order defined the term "subassemblies" as "any completed or partially completed circuit modules, the value of which is equal to or greater than five dollars, and which are dedicated exclusively for use in CMT transceivers or control units." 50 Fed.Reg. at 51,725. The order further provided that the phrase "dedicated exclusively for use in CMT transceivers or control units" encompassed only "those subassemblies that are specifically designed for use in CMTs, and could not be used, absent alteration, in a non-CMT device." Id. The order listed examples of the types of subassemblies that would fall within the scope of the order if they were dedicated exclusively for use in CMT transceivers or control units; the examples included circuit modules containing components such as duplexers and power amplifiers. Id.
 
 
 5
 Five Japanese importers of electronic products challenged the CMT antidumping duty order as too broad in its coverage of CMT subassemblies. The Court of International Trade, however, upheld the order, and this court affirmed. Mitsubishi Elec. Corp. v. United States, 700 F.Supp. 538 (Ct.Int'l Trade 1988), aff'd, 898 F.2d 1577, 8 Fed.Cir. (T) 45 (1990).
 
 
 6
 Shortly after the antidumping duty order was issued, Murata Manufacturing Co. and Murata Erie North America, Inc. (collectively, Murata) requested a ruling as to whether 11 electronic components that Murata produced and distributed were within the scope of the order. See 19 C.F.R. Sec. 353.29. Murata offered evidence that each of the components could be used in non-CMT applications and therefore argued that none of the 11 products was "dedicated exclusively for use" in CMTs.
 
 
 7
 After an unexplained five-year delay, the Commerce Department issued a scope determination that was responsive to Murata's scope request. The Department concluded that all 11 Murata products were CMT "subassemblies" and thus fell within the scope of the antidumping duty order as the Department interpreted it.
 
 
 8
 In response to Murata's argument that the products at issue were not "dedicated exclusively for use" in CMTs, as required by the antidumping duty order, the Department explained that "hypothetical uses are not sufficient to exclude subassemblies from the order." Granting an exemption to CMT subassemblies for which importers could demonstrate some hypothetical non-CMT use would invite evasion, the Department explained. Therefore, the Department stated that the order would be interpreted to require proof of actual use in alternative applications, not merely proof that they could conceivably be used in some non-CMT device.
 
 
 9
 In addition, the Department required that an importer presenting an item for exclusion from the antidumping duty order must demonstrate that the item is "commercially available for use in a non-CMT device." Evidence of commercial availability is necessary, the Department explained, "to prove that there is a viable market for the subassembly in a non-CMT device"; absent such a requirement, "it would be too easy to create a one-time use for an electrical component for the sole purpose of evading the order."
 
 
 10
 Finally, the Department required the importer to show that the subassembly was incorporated into a non-CMT device subsequent to its importation into the United States. That requirement was consistent with the antidumping duty order, the Department stated, because "if all of the merchandise in question is used in the United States exclusively in CMTs, then it is 'dedicated exclusively for use' in CMTs within the meaning of the order."
 
 
 11
 Murata and several manufacturers and importers of Japanese electronic products challenged the Murata scope determination before the Court of International Trade, claiming that the scope determination had impermissibly broadened the antidumping duty order. The Court of International Trade agreed, holding that the 1991 scope determination effectively altered the definition of covered subassemblies in the 1985 antidumping duty order. The court therefore vacated the scope determination as unsupported by the 1985 order.
 
 
 12
 The court then examined the record in light of what it deemed to be the correct interpretation of the 1985 order. The court found that Murata had established that nine of the products at issue could be used absent alteration in non-CMT devices and thus were outside the reach of the antidumping duty order. With respect to the two remaining products, the court found the record insufficient to permit it to determine whether the antidumping duty order covered them. As to those products--two types of duplexers used in portable cellular telephone (PCT) "boosters"--the court remanded the matter to the Commerce Department for a determination whether a PCT booster is a CMT "transceiver or control unit" within the meaning of the order, and therefore whether the use of the duplexers in the PCT boosters constituted a non-CMT use for the duplexers. Ericsson I, 825 F.Supp. at 1094-95.
 
 
 13
 On remand, the Commerce Department determined that PCT boosters fell within the reach of the order, on two grounds. First, the Department found that a PCT booster is a CMT "transceiver" because "a booster performs certain necessary functions common to all CMTs, which typically reside in a traditional transceiver." Second, the Department found that boosters satisfy the definition of CMTs found in the 1985 order, i.e., they are "radio-telephone equipment designed to operate in a cellular radio-telephone system," and they are not specifically excluded from the order. See Anti-Dumping Duty Order: Cellular Mobile Telephones and Subassemblies From Japan, 50 Fed.Reg. at 51,725.
 
 
 14
 The Court of International Trade once again rejected the Commerce Department's position. It held that Murata's duplexers, which are used in PCT boosters, are not "dedicated exclusively for use in CMT transceivers or control units," because a booster is not a CMT transceiver. The court explained that, under the definition in the 1985 antidumping duty order, a transceiver is a device that receives and transmits calls; a booster, on the other hand, does not receive and transmit calls, but simply receives and transmits signals. Because a booster does not convert incoming radio signals into audio signals or outgoing audio signals into radio signals, the court held that it does not satisfy the definition of a transceiver.
 
 
 15
 With respect to the Department's finding that boosters are within the antidumping duty order even if they cannot be characterized as "transceivers," the court held that the language relied upon by the Commerce Department was the definition of CMTs and that boosters are not CMTs. The court therefore entered judgment in favor of the plaintiffs, holding that the two duplexers, like the other Murata products at issue in the scope determination, fell outside the scope of the antidumping duty order. Ericsson II, 850 F.Supp. at 38-39.
 
 
 16
 Motorola, which appeared as a defendant-intervenor in the Court of International Trade, took this appeal. Although the United States participated in other proceedings involving the CMT antidumping duty order and the Murata scope determination, it did not pursue an appeal from the judgments in this case.
 
 II
 
 17
 Motorola's principal contention on appeal is addressed to the first opinion of the Court of International Trade, which the parties have denominated Ericsson I. Motorola contends that the Court of International Trade erred when it held that the Commerce Department's interpretation of the CMT antidumping duty order went beyond the limits of interpretation and constituted an impermissible modification of the order.
 
 
 18
 * The Commerce Department enjoys substantial freedom to interpret and clarify its antidumping duty orders. But while it may interpret those orders, it may not change them. See Smith Corona Corp. v. United States, 915 F.2d 683, 686, 8 Fed.Cir. (T) 180, 182 (1990).
 
 
 19
 After careful review, we conclude that the Murata scope determination broadened the reach of the original antidumping duty order with respect to CMT subassemblies. Under the 1985 order, a subassembly would be excluded unless it was "specifically designed for use in CMTs, and could not be used, absent alteration, in a non-CMT device." Under the scope determination, a subassembly would be excluded only if (1) it had some actual, demonstrated use in a non-CMT device, (2) it was commercially available for that non-CMT purpose in the United States, and (3) it was incorporated into the non-CMT product after importation. A comparison of the 1985 order and the 1991 scope determination makes clear that the Commerce Department's purported "clarification" of the antidumping duty order strayed beyond the limits of interpretation and into the realm of amendment. Accordingly, the Court of International Trade was correct in vacating the Murata scope determination.
 
 
 20
 To be sure, it was not unreasonable for the Commerce Department to interpret the antidumping duty order to exclude products that were used as CMT subassemblies only upon proof that the products had some other actual use; the phrase "could ... be used" is not necessarily limited to any conceivable, hypothetical use, but can reasonably be interpreted to require some existing use to which the product could realistically be put. An "actual use" interpretation would also be consistent with the purpose of the antidumping duty order--to apply the antidumping duty to products that are being imported solely for use in CMTs. Thus, one fair construction of the phrase "could ... be used" is that a particular item "could" be used in a non-CMT device only if there is an actual use for it in such a product.
 
 
 21
 In addition, the Commerce Department was legitimately concerned that foreign manufacturers might incorporate a subassembly into a contrived non-CMT product for a one-time use in an effort to evade the antidumping duty. The Department therefore could properly have considered the absence of commercial availability as a factor weighing against the conclusion that the subassembly could realistically be used in a non-CMT product. It stretches the meaning of the phrase "could ... be used" too far, however, to impose an absolute requirement of commercial availability of the subassembly. For example, a manufacturer might internally produce all of the subassemblies it requires to make a non-CMT product. In such a situation, a commercial market for the subassembly in its non-CMT use would not be necessary to establish that the subassembly "could ... be used, absent alteration, in a non-CMT device."
 
 
 22
 Finally, the Court of International Trade was correct in concluding that it stretches the phrase "could ... be used ... in a non-CMT device" considerably beyond the limits of interpretation to require that the subassembly be incorporated in a non-CMT device after its importation into the United States. The Court of International Trade reached the same conclusion in a previous case involving the 1991 scope determination, see Mitsubishi Elec. Corp. v. United States, 802 F.Supp. 455, 461 (Ct.Int'l Trade 1992), aff'd mem., 11 F.3d 1070 (Fed.Cir.1993), and Motorola does not vigorously challenge that aspect of the decision below.
 
 
 23
 The problem with the Department's interpretation of the antidumping duty order is not that it focused on inapposite factors; to the contrary, the factors that it emphasized were quite pertinent. It would have been entirely appropriate for the Department to consider those factors in determining whether particular devices had some realistic use in non-CMT products. The problem is that by imposing the rigid requirements of proof of commercial availability and non-CMT use in the United States, the Department in effect abandoned one rule and adopted a different, more exacting one.
 
 B
 
 24
 Although the Commerce Department's scope determination was flawed, the Court of International Trade should not have entered final judgment for the plaintiffs on the record before it. As the agency charged with administering the antidumping duty program, the Commerce Department is responsible for interpreting the antidumping duty order and determining whether certain products fall within the scope of the order as interpreted. In light of the Commerce Department's broad discretion to interpret antidumping duty orders and the limited scope of judicial review of the agency's actions in such cases, see 19 U.S.C. Sec. 1516a(b)(1)(B), we conclude that the Commerce Department should be given another opportunity to interpret the order at issue in this case.
 
 
 25
 By applying its own interpretation of the 1985 antidumping duty order and concluding in Ericsson I that nine of Murata's products were outside the scope of that order, the Court of International Trade in essence held that it would be impossible for the Department of Commerce to arrive at a supportable interpretation of the order under which any of the nine products would fall within its scope. We do not agree that the record in this case forecloses any possibility that the Department could find some or all of the products to be within a legally sustainable interpretation of the order.
 
 
 26
 Because we disagree with the conclusion of the Court of International Trade that the "could ... be used" language can only refer to potential use, we must reverse on this issue and remand the case for further proceedings. Although the Department's 1991 interpretation of the order exceeded its authority, the Department retains the discretion to interpret the order according to any of its legally acceptable options. After the Department arrives at a legally permissible interpretation of the 1985 order, the evidence regarding the non-CMT use of the Murata products at issue must then be reassessed in light of that interpretation.
 
 
 27
 At oral argument, the appellees contended that Motorola may not seek a remand to the Commerce Department, because it did not request such relief before the Court of International Trade. Before that court, however, Motorola was defending the Commerce Department's decision. There was no reason for it to seek a remand; it was seeking an outright affirmance of the Department's order, not some lesser form of relief. What is more, this court is authorized to order a remand in the exercise of its authority to select the most appropriate relief in a case before it. See 28 U.S.C. Sec. 2106. One party may not deprive the court of authority to order a remand by failing to request that relief in the lower court.
 
 
 28
 We share the concern of the Court of International Trade with the extraordinary length of time that this proceeding has taken, and we can certainly understand the court's desire to bring this long-delayed matter to a close. Nonetheless, the court's interpretation of the order is not necessarily the only lawful one. We therefore remand this case for further proceedings, including further assessment by the Commerce Department of the status under the antidumping duty order of the nine products involved in Ericsson I. In light of the delay that has plagued this proceeding to date, we urge that the remand process be expedited.
 
 III
 
 29
 We now turn to Ericsson II, which presents the question whether two of the Murata "duplexers" are within the scope of the antidumping duty order. The two duplexers are subassemblies of PCT boosters. A PCT booster contains a radio frequency power amplifier and a duplexer. The amplifier boosts the radio signal of a PCT from 0.6 watts to 3.0 watts, the wattage at which CMTs operate, and thus allows a portable cellular telephone to function as a CMT. The duplexer permits the simultaneous transmission and receipt of radio signals.
 
 
 30
 The Court of International Trade concluded that boosters are not CMT "transceivers," because they do not send and receive "calls," as is required by the antidumping duty order, but merely send and receive "signals." That is, although boosters contain electronic equipment that is necessary to send and receive radio signals, they do not convert the radio signals into audio signals.
 
 
 31
 We do not find the "call-signal" distinction persuasive. It is not unreasonable for the Commerce Department to interpret the term "call," as used in the antidumping duty order, to refer to the radio frequency signal sent and received by electronic equipment, as opposed to the audio frequency signal that is converted into a radio signal before transmission and produced from a radio signal after reception. Indeed, as the Department pointed out in its 1993 ruling on remand from the Court of International Trade, a restrictive definition of the term "call" would exclude even traditional transceivers from the reach of the antidumping duty order, since even traditional transceivers require the assistance of a control unit before a call can be received or transmitted. Moreover, the emphasis of the Court of International Trade on one word in the antidumping duty order to overturn an interpretation runs contrary to precedent. This court has previously held that the Department's practice of using other materials (such as preliminary and final determinations by the Department and by the International Trade Commission, or the antidumping petition) to illuminate the scope of the order is a legally acceptable interpretive practice. See Nitta Indus. Corp. v. United States, 997 F.2d 1459, 1461 & n. 3 (Fed.Cir.1993); see also 19 C.F.R. Sec. 353.29.
 
 
 32
 The 1985 antidumping duty order contemplated that CMT functions would generally be allocated between a transceiver and a control unit. To interpret the order as limited to components conventionally denominated as transceivers and control units would permit manufacturers to evade the order easily, by simply transferring a few functions from the CMT transceiver to the control unit. It is therefore permissible for the Department to define as a "transceiver" any component of a CMT that performs some functions of a CMT transceiver, even if other conventional transceiver functions have been allocated to a component that performs control unit functions, as is the case when a booster operates in tandem with a PCT. That approach is consistent with the definition of transceiver in the antidumping duty order, which includes any "box of electronic subassemblies which receives and transmits calls."
 
 
 33
 Because the basic booster satisfies the broad definition of a CMT transceiver found in the antidumping duty order, and because, as the Commerce Department explained, "there can be no bright line distinguishing the functions that clearly must reside in an item characterized as a control unit from those of a transceiver," it was reasonable for the Department to characterize a booster as a "CMT transceiver," as that term is used in the antidumping duty order.
 
 
 34
 We do not find persuasive the appellees' contention that a PCT booster cannot be a CMT transceiver, because it is an accessory to a PCT and a PCT is specifically excluded from the scope of the antidumping duty order. A portable telephone that is capable of operating at 3 watts when coupled with a booster is defined by the Commerce Department as a portable combination unit (PCU). In the remand proceedings the Department found that boosters "create a 3.0-watt CMT when used in combination with a portable combination unit." Thus, when properly viewed, boosters are not accessories to PCTs, items that are excluded from the scope of the order, but instead are accessories to PCUs, items that the Commerce Department has determined not to be per se outside the scope of the order. Because a booster's purpose is to permit communication at CMT wattage, it is fairly characterized as a component of a CMT.
 
 
 35
 The Commerce Department offered a second rationale for its ruling on the two duplexers. The Department reasoned as follows: (1) the antidumping duty order defines a CMT as "radio-telephone equipment designed to operate in a cellular radio-telephone system"; (2) a booster satisfies that definition; (3) a booster is not excluded from the reach of the order by the provision specifically excluding certain products, such as PCTs, cellular base stations, and cellular base station apparatus; and (4) a booster therefore falls within the reach of the order without regard to whether it can properly be characterized as a CMT transceiver.
 
 
 36
 The Court of International Trade rejected that analysis. It found that the Department had unlawfully expanded the scope of the order because the definitional language on which the Department relied "appears as the definition of a CMT and not as a description of the boosters." Ericsson II, 850 F.Supp. at 38.
 
 
 37
 We do not find it necessary to address this alternative ground for bringing boosters within the reach of the order. We have concluded that the Department's determination that basic boosters fall within the definition of CMT transceivers in the antidumping duty order represents a permissible interpretation of that order, and on that ground alone we vacate the order of the Court of International Trade in Ericsson II.
 
 
 38
 That, however, does not end the inquiry. Proof that Murata's duplexers are used in basic boosters and that basic boosters are covered by the order does not necessarily establish that the duplexers are "subassemblies" within the meaning of the antidumping duty order, i.e., that they are "completed or partially completed circuit modules ... which are dedicated exclusively for use in CMT transceivers or control units." Final Determination, 50 Fed.Reg. at 45,448. Although the Court of International Trade did not resolve the issue, the appellees ask us to uphold that court's order in Ericsson II on the ground that the duplexers cannot qualify as "circuit modules" under any proper definition of that term. We decline to do so. In the absence of a ruling from the Court of International Trade, we would be ill-advised to decide this technical question in the first instance. The question whether Murata's duplexers are "circuit modules" within the meaning of the order is therefore among the issues that the Court of International Trade may properly consider on remand or may, in its discretion, make the subject of further proceedings by the agency.
 
 
 39
 Each party shall bear its own costs.
 
 
 40
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.