NOVOSTEEL SA, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

Bethlehem Steel Corporation and U.S. Steel Group, a unit of USX Corporation (now known as United States Steel LLC), Defendants–Appellees.

No. 01–1274.

United States Court of Appeals, Federal Circuit.

DECIDED: March 26, 2002.

Pamela L. St. Peter, Edmund Maciorowski, P.C., of Bloomfield Hills, Michigan, argued for plaintiff-appellant. With her on the brief was Edmund Maciorowski.

Mark L. Josephs, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Velta A. Melnbrencis, Assistant Director. Of counsel was A. David Lafer, Senior Trial Counsel. Of counsel on the brief were John D. McInerney, Chief Counsel for Import Administration; Berniece A. Browne, Senior Counsel; and David W. Richardson, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

Jennifer Danner Riccardi, Dewey Ballentine LLP, of Washington, DC, argued for defendants-appellees. With her on the brief were Michael Stein, Bradford L. Ward, and Jon Avins. Of counsel were Rory F. Quirk, and Navin Joneja.

Before MICHEL, LOURIE and DYK, Circuit Judges.

MICHEL, Circuit Judge.

Plaintiff–Appellant Novosteel SA appeals a decision by the United States Court of International Trade holding that antidumping and countervailing duty orders addressed to "cut-to-length carbon steel plate from Germany" applied to the steel "profile slabs" that Novosteel was importing from a German company called Reiner Brach. *Novosteel SA v. United States,* 128 F.Supp.2d 720, 722 (CIT 2001). Specifically, the court determined that substantial evidence supported the scope determination by the Commerce Department that the two orders, as well as the initial sources of evidence used to interpret them (*i.e.,* the petitions for the orders and the initial determinations by Commerce and

the International Trade Commission), did not unambiguously include or exclude the profile slab at issue. As a result, the court said, Commerce properly resorted to the five-part *Diversified Products* criteria to clarify the orders' scope. And the application of those criteria, the court concluded, showed that these two orders did indeed cover the Reiner Brach profile slab.

We affirm the judgment of the Court of International Trade. First, contrary to Novosteel's suggestions, the petitions that led to the issuance of the orders did not need to specifically identify the Reiner Brach profile slab in order to cover them; our precedent, to say nothing of the regulations, makes clear that neither a petition nor an antidumping or countervailing duty order requires that level of specificity. Similarly, the fact that neither the petitions nor the orders (called the "Plate Orders") listed the specific "HTSUS" (Harmonized Tariff Schedule of the United States) number assigned to the Reiner Brach profile slab does not mean that the Orders also unambiguously excluded this product. As a matter of law, a petition need not list the entire universe of products or the numbers assigned to them under the HTSUS in order to cover those products. And the petitions here, as more fully explained below, described the products covered by the Orders using "dimensional" criteria and other definitions; they did not define the scope of the requested Orders in terms of the HTSUS and thus did not purposefully limit themselves to the HTSUS products that the petitions did list. And so, the omission of the HTSUS number for Reiner Brach profile slab does not mean that the Orders necessarily excluded that product.

Next, we discern no reversible error with the definition that the court assigned to a disputed term ("flat-rolled") in the Orders. Novosteel, simply put, has not

explained how the court's definition differs in any material respect from the definition that Novosteel asserts the court should have used—the HTSUS definition of "flat-rolled." Meanwhile, nothing in an earlier scope determination, *see Wirth Ltd. v. United States*, 5 F.Supp.2d 968 (CIT 1998), indicates that the Commerce Department had to apply a certain meaning to the terms "flat-rolled" or "further worked" so that they could encompass only a set type, number and order of steel-production processes. And substantial evidence—including a brochure that the German exporter (Reiner Brach) used to describe its profile slabs—supports the finding that Reiner Brach could have had additional treatment or processes performed on its steel profile slab, *i.e.*, that it was possibly having this steel "further worked" within the meaning of the Orders, thereby justifying resort to the *Diversified Products* criteria. Last, by not raising an argument about the retroactive application of a scope determination until it filed its summary judgment reply brief, Novosteel has waived the right to have us address that argument in the first instance.

## Background

This case presents the question whether two related antidumping and countervailing duty orders addressed to a type of steel imported from Germany covered the steel "profile slab" that Plaintiff–Appellant Novosteel had imported for approximately four years.

### A. The Plate Orders Issue in 1993.

In the early 1990s, Bethlehem Steel and the other Defendant–Intervenors in this case filed petitions with officials of the Commerce Department asking that they investigate and issue antidumping and countervailing duty orders against certain cut-to-length steel imported into the Unit-

ed States from Germany. As with all such petitions filed with Commerce, Bethlehem Steel and the other domestic steel producers alleged that companies were importing and selling steel from Germany below cost and were thereby causing "material harm" to domestic steel sellers.

In their petitions, the Defendant–Intervenors did not specifically identify "profile slab," much less the profile slab exported by the German company Reiner Brach, as a product that fell within the scope of its petitions. In the section entitled "Scope of Investigation and Description of the Merchandise," the petitions instead refer to the dimensional characteristics of the steel covered by the requested Orders, as well as to definitions from the "American Iron and Steel Institute product categories" and the "American Society for Testing and Materials standards specification numbers." On one page, the petitions also refer to and quote (in a footnote) the definition of "flat-rolled products" according to the Harmonized Tariff Schedule of the United States. (J.A. 88 n. 5) (quoting HTSUS, Chapter 72, Note 1(k)). Generally, however, the six pages devoted to the respective petitions' "description of merchandise" define the type of steel at issue with little reference to the HTSUS.

On the last page of this section, the petitions do list certain products according to the HTSUS classification numbers that the Customs Service had assigned to them. As the petitions themselves stated, products with these HTSUS numbers were "covered by [these] Petition[s]." The classification number "HTSUS 7207"—the number later assigned to Novosteel's imported profile slab—does not appear among them.

In August 1993, the Commerce Department, having investigated the Defendant–Intervenors' petitions, went ahead and issued both antidumping and countervailing duty orders directed to the importation of "cut-to-length carbon steel plate from Germany." The two orders, called the "Plate Orders," defined the products that they covered as:

> Certain hot-rolled carbon steel *flat-rolled products* in straight lengths, of rectangular shape, hot rolled, neither clad, plated, nor coated with metal, whether or not painted, varnished, or coated with plastics or other nonmetallic substances, 4.75 millimeters or more in thickness and of a width which exceeds 150 millimeters and measures at least twice the thickness . . . .

58 Fed. Reg. 43,756, 43,758 (Aug. 17, 1993); 58 Fed. Reg. 44,170 (Aug. 19, 1993) (emphasis added). As with the earlier petitions, the Plate Orders did not list HTSUS 7207 as one of the products that they covered. The Orders did state, however, that the listing of classification numbers did not alone determine whether any particular product fell within their scope: "Although the Harmonized Tariff Schedule of the United States ... subheadings are provided *for convenience and customs purposes, our written descriptions of the scope of these proceedings are dispositive.*" *Id.* (emphasis added).

## B. Novosteel Imports Reiner Brach Profile Slab from 1994 to 1998.

In June 1994, Novosteel (through its wholly owned subsidiary Barzalex) began importing into the United States a type of steel called "profile slab" from Reiner Brach GmbH & Co. A few months earlier, Novosteel had obtained a ruling letter from the Customs Service that classified this profile slab under the "heading 7207, HTSUS." The heading signified that, in the view of the Customs Service, the profile slab constituted an "unfinished product of iron or non-alloy steel." In addition, because the 1993 Plate Orders did not

specifically list HTSUS 7207, Customs did not require Novosteel to pay estimated antidumping or countervailing duties on this product at the time of entry. Novosteel proceeded to import Reiner Brach's profile slab for the next four years without having to pay any estimated import duties.

In June 1998, however, Customs officials informed Novosteel that a review of its import record showed that the Reiner Brach profile slab did indeed fall within the scope of the Plate Orders. Novosteel stopped importing the Reiner Brach profile slab in July 1998, though it "effectuated 14 entries" of this product between August 1998 and February 1999. Also in August 1998, Novosteel followed the advice given by Customs officials and requested a scope determination by the Commerce Department about whether the Plate Orders did indeed cover the Reiner Brach profile slab it was importing. See 19 C.F.R. § 351.225(c) (setting forth the procedures for obtaining a determination about the scope of an antidumping or countervailing duty order).

## C. The Commerce Department Concludes that the Reiner Brach Profile Slab Falls within the Scope of the Plate Orders.

In March 1999, Commerce issued its initial scope determination, finding that the Plate Orders did appear to cover the Reiner Brach profile slab. After the parties filed additional comments, Commerce concluded in May 1999 that, "based upon a review of the underlying record," the profile slab here did indeed constitute the kind of carbon steel covered by the Plate Orders. In so concluding, however, Commerce reasoned that neither the petitions' descriptions of the merchandise nor the initial investigations by Commerce and the International Trade Commission conclusively showed whether the Plate Orders

applied here. Instead, said Commerce, its conclusion about whether the profile slabs were "flat-rolled" within the meaning of the Plate Orders rested on the application of the five-part *Diversified Products* criteria. See 19 C.F.R. § 351.225(k)(2) (1998) (setting forth criteria used to determine whether a particular product is covered by an antidumping or countervailing duty order when an examination of the petition, and the initial investigation and determinations of Commerce and the International Trade Commission "are not dispositive"); *Diversified Prods. Corp. v. United States*, 572 F.Supp. 883 (CIT 1983) (establishing the criteria mentioned above).

## D. The Court of International Trade Affirms.

Novosteel thereafter filed a complaint with the Court of International Trade challenging the rulings of the Commerce Department as unsupported by substantial evidence. Relying on the agency record compiled before Commerce, Novosteel then moved for summary judgment. See U.S. CIT R. 56.2.

In a thorough opinion, the Court of International Trade upheld Commerce's scope determination, denied Novosteel's summary judgment motion and entered judgment for the government. In particular, the court concluded that Commerce did properly resort to the *Diversified Products* analysis because, first, a review of the petitions and initial investigations did indeed fail to clarify whether the term "flat-rolled," as used in the Plate Orders, unambiguously included or excluded the Reiner Brach profile slab. Citing precedent, the court added that simply because the Orders did not explicitly identify the Reiner Brach profile slab itself did not mean that the Orders had also unambiguously excluded that product. *Novosteel*, 128 F.Supp.2d at 726.

In a similar vein, the court rejected Novosteel's assertion that because the Plate Orders did not list HTSUS 7202 (the HTSUS number that Customs assigned to Reiner Brach profile slab) and because the " '[p]etitioners described the merchandise included within the order[s] . . . within the context of HTS[US] nomenclature,' " that omission, too, showed that the Orders unambiguously excluded the profile slab. *Id.* at 727 (quoting Novosteel's Summ. J. Br. at 7). According to the court, the petitions instead defined the covered merchandise by using criteria that had nothing to do with the HTSUS, including (for example) criteria relating to "dimensional measurements" and to definitions from the "American Iron and Steel Institute product categories" and the "American Society for Testing and Materials standards specification numbers." *Id.*

And while the petitions also described the subject merchandise by referring to HTSUS classification headings, the court discounted this HTSUS reference as simply a requirement of the regulations. *See id.; see also* 19 C.F.R. § 351.202(b)(5) (setting forth requirements for petitions that request the imposition of antidumping or countervailing duties, including requirement that a petition list "the subject merchandise . . . and its current U.S. tariff classification number"). In other words, the court implied that the regulations neither set forth a requirement that a petitioner list every single HTSUS classification number that a putative order might cover, nor define the terms it uses in a petition by reference to the HTSUS. *See Novosteel,* 128 F.Supp.2d at 727–28. Commerce, moreover, stated in the Plate Orders themselves that it was providing these HTSUS headings "for convenience and customs purposes"; the written descriptions of the merchandise still controlled the scope of the Orders. *Id.* at 727.

The court proceeded to examine the definition of the subject merchandise that Commerce did ascribe to the Plate Orders. Specifically, the court agreed that the operative term used in the Plate Orders was "flat rolled" and that the petitions did define that term by reference to the HTSUS. The HTSUS, Note 1(k), in turn defines "flat-rolled" as "rolled products . . . which *do not conform* to the definition at [Note] 1(ij)." *Novosteel,* 128 F.Supp.2d at 728 (emphasis added). HTSUS, Note 1(ij) sets forth a definition of "semi-finished products," saying it refers to products that "have not been *further worked* [other] than subjected to primary hot-rolling . . . ." *Id.* (emphasis added). By implication, then, the HTSUS definition of "flat-rolled" referred to products that have been "further worked [beyond] . . . primary hot-rolling." *Id.*

The court then noted, however, that it was rejecting the argument that this HTSUS definition alone controlled the meaning of "flat-rolled," as the Plate Orders themselves used the term "flat-rolled" (not "further worked"). Instead, the court indicated that it would simply consider this HTSUS definition as one of the factors that would help clarify the meaning of that term. *Id.* at 728–29. Further, because neither party offered an unambiguous definition of "further worked," *see id.* at 729, the court relied on a common dictionary definition of the term "further worked," just as it had done in another case involving the "further worked" language. *Id.* (citing *Winter–Wolff v. United States,* 996 F.Supp. 1258, 1265 (CIT 1998)). Ultimately, then, the court defined "further worked" as meaning to "subject an existing product to some process of development, treatment or manufacture beyond primary hot-rolling." *Id.*

Given that definition, the court next held that "[f]ive pieces of evidence" supported

Commerce's finding that Reiner Brach profile slab could have possibly undergone some additional process or treatment, *i.e.*, could have been "further worked," and that a final determination about the Orders' coverage thus required application of the *Diversified Products* criteria. *Id.* at 729–32. Most prominently, the sales brochure that Reiner Brach distributed to U.S. customers indicated as follows: that the company intended to use its profile slabs "to augment the shrinking supply of very expensive thick plate [*i.e.*, flat-rolled steel] on the world steel markets," (J.A. 758); that Reiner Brach "has, over the years, worked closely with its liquid steel producers to melt cleaner and better steel," (*id.*); that it uses "[u]ltrasonic testing ... manually on each finished slab to provide [Reiner Brach's] customers with internal integrity assurance," (*id.*); and that it uses a *"hydraulic press as well as a five roll flattening machine"* to guarantee *"[f]latness within close tolerances,"* (J.A. 759) (emphasis added). In addition, Novosteel's brief evidently admitted that Reiner Brach had its steel profile slab produced at a "facility 'commonly described as a two high reversing mill,'" a mill used to manufacture the type of plate or flat-rolled steel covered by the Plate Orders. *Novosteel,* 128 F.Supp.2d at 729 (quoting Pl.'s Br. at 3).

After concluding that this evidence supported Commerce's finding that the Plate Orders did not unambiguously include or exclude this product, the court then applied the *Diversified Products* criteria to the other relevant evidence, *e.g.*, a survey about the tolerances for Reiner Brach profile slab, various responses by Novosteel to Commerce's questionnaires, a specification guide showing that one could have the profile slab substituted for plate steel in certain applications, excerpts from a treatise, documents and other evidence indicating that Reiner Brach had changed its

name and had attempted to sell profile slabs to its existing customers for cut-to-length plate, the information contained in Reiner Brach's sales brochure, etc. *Id.* at 732–38. In the end, the court determined that the Plate Orders did apply to the Reiner Brach profile slab. Nothing in the court's opinion addresses the issue whether Novosteel should have to pay the estimated antidumping duties for the profile slab it imported for four years without penalty, *i.e.*, whether imposition of duty payments for those years would have an impermissible retroactive effect. Novosteel, however, did not present this argument in its summary judgment briefing until it filed its reply brief.

### E. Novosteel's Arguments on Appeal.

Reduced to its essentials, Novosteel's appeal appears to present six issues for our consideration. First, Novosteel seems to suggest that because the Plate Orders did not specifically identify Reiner Brach profile slab, the Commerce Department and the Court of International Trade strayed beyond a "bright line" by construing the Orders so that they did encompass its steel profile slab. Second, we alternatively construe Novosteel's broad argument here to mean that, because the Orders speak in terms of the HTSUS and because those Orders also failed to list the HTSUS number for the Reiner Brach profile slab (HTSUS 7207), they must also unambiguously exclude this HTSUS number (and, of course, the profile slab covered by that HTSUS number). Third, Novosteel intimates that Commerce erred by not adopting the HTSUS definition of "flat-rolled," though it has not explained why this HTSUS definition differs in any significant way from the definition actually used by Commerce and the court.

Fourth, in Novosteel's view, Commerce and the court erred because they deviated

from a definition of "further worked" that Commerce had rendered in another scope determination without offering any reasons for that deviation. Fifth, pointing to the agency record generally and the Reiner Brach brochure specifically, Novosteel suggests that substantial evidence does not support Commerce's scope determination because the brochure cited by the agency and the court showed only a "capability" of having the steel profile slab "flat-rolled"; no evidence, according to Novosteel, shows that Reiner Brach actually went about exercising this capability. Last, Novosteel presents the same argument that it did not raise with the Court of International Trade until it filed its summary judgment reply brief; namely, that Commerce was impermissibly applying its scope determination to more than four years' worth of imports of Reiner Brach profile slab. We address each of these arguments in turn.

## Discussion

■ In so doing, we use the same standard of review that the Court of International Trade uses when reviewing scope determinations by the Commerce Department: whether substantial evidence supports Commerce's determination and whether that determination accords with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (1994); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed.Cir.1997); *Nitta Indus. Corp. v. United States*, 997 F.2d 1459, 1460 (Fed.Cir.1993). Substantial evidence consists of evidence that a "reasonable mind might accept as adequate to support a conclusion." *Gerald Metals, Inc.*, 132 F.3d at 720. In addition, we also give "due respect" to the "informed opinion of the Court of International Trade." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed.Cir.1994). Applying this deferential standard of review, we affirm the court's judgment.

## A. The Petition for the Plate Orders Did Not Unambiguously Exclude the Profile Slab.

■ To begin with, the description of the merchandise contained in the petitions does not show that the Plate Orders unambiguously excluded the Reiner Brach profile slab, contrary to Novosteel's assertion. The "Commerce Department enjoys substantial freedom to interpret and clarify its antidumping orders. But while it may interpret those orders, it may not change them." *Ericsson GE Mobile Communications, Inc. v. United States*, 60 F.3d 778, 782 (Fed.Cir.1995); *accord Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed.Cir.1990).

■ The applicable regulations explain how Commerce will determine "whether a particular product is included within the scope of an [antidumping or countervailing duty] order." 19 C.F.R. § 351.225(k). First, Commerce will examine the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary [of Commerce] and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1). Note that, in setting forth the "descriptions of the merchandise contained" in its petition, *see id.*, a petitioner (like Bethlehem Steel) need not "circumscribe the entire universe of articles" that might possibly fall within the order it seeks. *Nitta Indus.*, 997 F.2d at 1464; *accord Wirth*, 5 F.Supp.2d at 976 (stating that the " 'absence of a reference to a particular product in the Petition does not necessarily indicate that the product is not subject to an order' ") (citation omitted). Indeed, the regulations themselves recognize that Commerce must conduct scope determinations in the first place because the "descriptions of the subject merchandise ...

must be written in *general terms.*" 19 C.F.R. § 351.225(a) (emphasis added).

Second, if a review of these initial criteria does not definitively resolve whether an order covers a particular product, Commerce must then consider the five *Diversified Products* criteria. These criteria consist of the "physical characteristics of the [subject] product," the "expectations of the ultimate purchasers," the "ultimate use of the product," the "channels of trade in which the product is sold," and the "manner in which the product is advertised and displayed." 19 C.F.R. §§ 351.225(k)(2)(i)—(v).

In this case, no language in the petitions unambiguously excludes the Reiner Brach profile slab from the scope of the Plate Orders. Indeed, as the Court of International Trade noted, the Orders did expressly list some of the products not covered by the Orders; but Reiner Brach profile slab was not among them. Nor has Novosteel identified any language in any of the sources (the petitions and the initial determinations by Commerce and the ITC) used to initially construe those Orders that would exclude its imported product. In short, then, Novosteel's first argument seems to rely on a proposition that Commerce (via regulation) and the courts have roundly rejected—the proposition that a petition must expressly and specifically identify all the products covered by the order at issue. *See* 19 C.F.R. § 351.225(a); *Nitta Indus.; Wirth, supra.* For these reasons, we reject it here as well.

**B. Antidumping/Countervailing Duty Orders and the HTSUS.**

■ Liberally construing Novosteel's argument about the allegedly unambiguous scope of the Orders, we also conclude that the petitions' omission of the HTSUS number assigned to Reiner Brach profile slab does not strengthen Novosteel's appeal.

As stated above, Novosteel claimed before the Court of International Trade that the petitions requesting the Plate Orders spoke of the relevant steel product in "HTSUS nomenclature"; and thus, the argument goes, the listings of the HTSUS classification numbers in the petitions actually defined the entire realm of products covered by the Plate Orders.

This argument fails for several reasons. For one thing, as the Court of International Trade explained, the petitions hardly defined the scope of the products in terms of the HTSUS; rather, they described the products covered by the Orders using "dimensional" criteria and references to non-HTSUS sources, *e.g.,* definitions from the "American Iron and Steel Institute" and the "American Society for Testing and Materials," in addition to references to the HTSUS. The HTSUS references, in other words, by no means dominated the petition so as to make that petition synonymous with the HTSUS listings themselves. The Plate Orders themselves make this point clear, saying that they were providing the HTSUS listings for "convenience and customs purposes" only and that the petitions' description of the merchandise still controlled the Orders' scope.

Our precedent has likewise indicated, meanwhile, that a reference to an HTSUS number "is not dispositive" about the scope of an antidumping or countervailing-duty order. *See Smith Corona,* 915 F.2d at 687. So too has the precedent from the Court of International Trade. *See Wirth,* 5 F.Supp.2d at 977–78 ("The inclusion of various HTSUS headings in a petition ordinarily should not be interpreted to exclude merchandise ... classified under an HTSUS heading not listed in the petition."), *aff'd,* 185 F.3d 882 (Fed.Cir. Feb. 2, 1999) (Table). We have no reason to now cast aside those precedents as something less than controlling in this case.

At the same time, we recognize that one of the applicable regulations does state that petitions must contain (among other things) a "detailed description of the subject merchandise that defines the requested scope of the investigation, *including ... its current U.S. tariff classification number.*" 19 C.F.R. § 351.202(b)(5) (emphasis added). But as the Court of International Trade also implied, that regulation does not in turn say that the failure to include a particular HTSUS number within a petition means the resulting Order will likewise exclude the product that is designated under that particular HTSUS classification number. *Compare Wirth,* 5 F.Supp.2d at 977 (rejecting argument that the regulations required a dispositive listing of all HTSUS numbers and concluding that the HTSUS list alone did not constitute the entirety of products covered by the petition or the order that followed). More important, Novosteel has not challenged the court's implicit interpretation of the regulation as either erroneous or as somehow offending (or exceeding) the statute from which it derives. We see no reason to make the argument for them. Further, we doubt that any argument to that effect would survive close scrutiny, given again that the regulations also contemplate the need to draft the scope of these orders "in general terms." *See* 19 C.F.R. § 351.225(a).

### C. The Court's Definition of "Flat–Rolled" versus the HTSUS Definition of "Flat–Rolled."

■ We need not comment on whether Commerce or the court used the proper methodology to arrive at a definition for "flat-rolled," the operative term at issue, or whether they should have relied solely on the HTSUS definition of that term. Even assuming that Novosteel has squarely presented this question for our review, it has nevertheless failed to explain how the HTSUS definition of "flat-rolled" differs in any material respect from the "flat-rolled" definition actually used by the court.

As noted in the court's opinion, HTSUS defines "flat-rolled" by contrasting it with another definition ("semi-finished"); thus, "flat-rolled" means products that are *not* "other products of a solid section, which *have not been further worked [other] than subjected to primary hot-rolling ....*" *Novosteel,* 128 F.Supp.2d at 728 (citations omitted) (emphasis added). Stated differently, HTSUS defines "flat-rolled" to refer to products that, in addition to "primary hot-rolling," have also been "further worked." The Court of International Trade, meanwhile, ultimately defined "flat-rolled" as meaning to "subject an existing product to some process of development, treatment or manufacture beyond primary hot-rolling."

As we see it, this definition looks every bit the same as the HTSUS definition. Novosteel has not even compared these two definitions, much less explained why they differ and why that difference should change the judgment of the court and the Commerce Department. At most, then, the ruling of the court here, even assuming it is error, amounts to nothing more than harmless error, *see* U.S. CIT R. 61.

### D. Nothing in the *Wirth* Decision Purports to Control the Definition of "Further Worked" (or "Flat–Rolled").

■ The Court of International Trade has held that Commerce must either act in accord with its prior, similar scope determinations or else provide "rational reasons for deviating" from them. *Springwater Cookie & Confections, Inc. v. United States,* 20 CIT 1192, 1196 (CIT 1996). Citing this principle, Novosteel asserts

that Commerce (and the court) erred because Commerce had allegedly defined "further worked" in another, similar scope determination (*see Wirth*) so that that term encompassed only a distinct set of steel-making processes; and that, in this case, Commerce disregarded the definition in *Wirth* without explaining why.

For purposes of this appeal, we assume without holding that the controlling principle is the principle laid down in *Springwater Cookie*. But as the Court of International Trade here reasoned, nothing in either its *Wirth* decision or in the underlying *Wirth* scope determination suggests that Commerce could assign only one meaning to the term "further worked" or, more important, to the term actually used in the Plate Orders, "flat-rolled," so as to limit those terms to a distinct and ordered set of processes only. Accordingly, while the scope determination in *Wirth* and the scope determination here share some similarities, *e.g.*, *Wirth* addressed the applicability of antidumping orders directed to cut-to-length carbon steel plate from Brazil, none of those similarities compels a contrary conclusion about the definition of "further worked," "flat-rolled" or the processes that they could and could not include.

### E. The Reiner Brach Sales Brochure.

■ Given our deferential standard of review, we also uphold Commerce's finding that Reiner Brach could possibly have had additional treatment done on its profile slabs so as to have that steel product "flat-rolled," *i.e.*, "further worked." As noted, the Court of International Trade and Commerce both largely based this finding on the brochure that Reiner Brach had admittedly circulated to its U.S. customers. This finding, moreover, led Commerce and the court to conclude that an examination

of the initial criteria (the petitions and the initial investigations by Commerce and the ITC) did not definitively resolve whether the Plate Orders included or excluded this particular product; and thus, that application of the *Diversified Products* criteria was necessary.

Mindful of the low threshold needed to show that Commerce here justifiably found an ambiguity, we agree that Reiner Brach's sales brochure, along with the admission that Reiner Brach produces its steel at a "two high reversing mill," provide the requisite substantial evidence. Most significant, the brochure states that Reiner Brach guarantees its steel meets strict *"flatness ... tolerances"* and that a *"hydraulic press as well as five roll flattening machine are employed to back up this guaranty."* (J.A. 759) (emphasis added). These statements alone could lead one to reasonably infer that, indeed, Reiner Brach uses equipment to produce "flat-rolled" steel, *i.e.*, steel that it had "further worked" beyond the hot-rolling process.

As if to strengthen that point, the brochure adds that the profile slab "augment[s] the shrinking supply of ... thick plate"—*i.e.*, flat-rolled steel—in the world. And that Reiner Brach undertakes certain processes in order to produce "very thick profiling slabs of superior internal integrity," as shown by the "ultrasonic testing ... performed manually on each finished slab to provide our customers with internal integrity assurance." Reasonably construed, a fact finder could read these other statements to confirm that Reiner Brach may indeed have undertaken processes to help refine and test its steel (*i.e.*, to "further work" its steel) and to thereby produce "profiling slabs of superior internal integrity." This inference is further bolstered by the admission that Novosteel apparently made in its brief about Reiner Brach having its profile slab produced at a

"two high reversing mill," a mill that is capable of producing the type of steel covered by the Plate Orders.

In a sense, a short brochure might seem like a slender reed on which to base a scope determination, especially one in which the appellate record alone includes more than 1300 pages. After all, one might think that the government or the Defendant–Intervenors could have had an expert (or several experts) examine one of Reiner Brach's profile slabs and determine one way or the other whether the steel exhibited signs of additional treatment or processes beyond primary hot rolling. Or that an expert could have examined other evidence, like the Reiner Brach brochure, and concluded that the statements in that brochure showed that the steel profile slab was "flat-rolled" within the technical meaning of that term.

But the final scope determination here did not actually turn on this brochure; the Commerce Department and the Court of International Trade instead considered the brochure's statements for the limited purpose of determining whether the Orders unambiguously included or excluded the Reiner Brach profile slab, thereby necessitating resort to the *Diversified Products* criteria and the record evidence addressed to those criteria, *e.g.*, a survey about the tolerances for Reiner Brach profile slab, the various admissions, answers to questionnaires and other information provided by Novosteel itself, a specification guide and treatise, as well as the information contained in Reiner Brach's sales brochure, etc. (Novosteel, unsurprisingly, does not challenge the court's thorough analysis under these latter criteria.) Further, other reasonable fact finders might just as well consider this brochure the proverbial smoking gun, an admission that Reiner Brach produces the very kind of "flat-rolled" steel covered by the Plate Orders.

In any event, our court of course plays a limited role in reviewing determinations by the Commerce Department. And so, even assuming we might find differently if we had to make these findings in the first instance, we obviously have no authority to do so now. *See Gerald Metals, Inc.*, 132 F.3d at 719–20 (reiterating the substantial-evidence standard of review as whether a reasonable mind might accept the evidence in the record as sufficient to support a conclusion). Nor do we think it necessary (or even justifiable) to scrutinize the record for other evidentiary arguments that Novosteel could have squarely presented but nevertheless did not, *e.g.*, that the "flatness" or the "five roll flattening machine" referred to in the Reiner Brach brochure means something different than the "flat-rolled" used in the Orders themselves. In the end, therefore, we cannot conclude that the brochure here constitutes something less than substantial evidence. Thus, we affirm the judgment with respect to this ruling, too.

### F. Waiver and the Retroactive Imposition of Antidumping Duties.

The last issue raised by Novosteel is whether Commerce could retroactively apply the Plate Orders, as construed in its scope determination, to the profile slab that Novosteel had imported for four years without paying estimated duties. Novosteel, however, failed to preserve this issue for our review, for it waived this retroactivity argument by not presenting it in the principal summary judgment brief filed with the Court of International Trade. *See Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1326, 59 USPQ2d 1823, 1830 (Fed.Cir.2001) (noting that appellate courts "only rarely" will entertain "evidence and issues ... not properly

raised in proceedings below"). Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further, the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat this argument as waived.

Novosteel, understandably enough, has tried its best to circumvent waiver, saying that it raised the question (as indeed it did) before the Commerce Department and that it alluded to the retroactivity argument in the complaint filed with the Court of International Trade (though only the most strained reading of the complaint would justify that latter assertion). But the sources it cites are irrelevant for waiver purposes. A party does not preserve or waive an issue based on the arguments it presented to an administrative agency; a party merely exhausts that issue before the agency so as to give a court the proper basis to review that issue on appeal or via a complaint. *See, e.g.,* *Sandvik Steel Co. v. United States,* 164 F.3d 596, 599 (Fed.Cir.1998). Similarly, a party does not waive an argument based on what appears in its pleading; a party waives arguments based on what appears in its brief.

So, given that Novosteel did not present its retroactivity argument to the Court of International Trade until after it had filed its principal summary judgment brief, and given that parties must give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief, we conclude that Novosteel has indeed waived this argument for purposes of our review.

## Conclusion

For the reasons stated above, the judgment of the Court of International Trade is

*AFFIRMED.*

DYK, Circuit Judge, dissenting in part.

The appellant's briefs are virtually awash in frivolous or unmeritorious arguments, which are properly rejected by the majority. However, I fear that the appellant's single meritorious argument has been lost in the shuffle.

On appeal to this court, the Department of Commerce ("Commerce") does not claim that the product is clearly within the 1993 antidumping and countervailing duty orders ("Plate Orders"); it asserts only that the Plate Orders are ambiguous, making resort to the *Diversified Products* criteria appropriate. The appellant disagrees, urging that the Plate Orders are not ambiguous and that its products are not within the scope of the Plate Orders. In my view, the disagreement here is not about the scope of the Plate Orders. Rather, Commerce has simply failed to make the necessary factual investigation to determine whether the product is within the agreed scope of the Plate Orders. In my view, the majority errs in concluding that the ambiguity in the Plate Orders is established by ambiguity in the present record. I do not think that the inadequacy in the present record makes the Plate Orders ambiguous.

I

Our decisions with respect to scope orders have established three propositions: (1) that Commerce has discretion to interpret its scope orders, *see Ericsson GE Mobile Communications, Inc. v. United States,* 60 F.3d 778, 782 (Fed.Cir.1995); (2) that Commerce cannot construe its scope

orders to include products that are outside those orders, see *Smith Corona Corp. v. United States,* 915 F.2d 683, 686 (Fed.Cir. 1990); and (3) that if a scope order is ambiguous, Commerce can resort to the *Diversified Products* criteria to determine whether the product is within the order, see *id.*

All parties appear to assume that the relevant question under the Plate Orders here is whether appellant's product is "flat-rolled" within the meaning of the Orders, 58 Fed. Reg. 43,756 (Aug. 17, 1993); 58 Fed. Reg. 44,170 (Aug. 19, 1993), and that "flat-rolled" is properly construed by reference to Harmonized Tariff Schedule of the United States ("HTSUS"), Chapter 72, Note 1(k), which in turn refers to HTSUS, Chapter 72, Note 1(ij).[1] Thus, the parties assume that the question of whether appellant's product was "flat-rolled" depends on whether appellant's product was "further worked." I also agree that the Court of International Trade properly defined "further worked" as "to subject an existing product to some process of development, treatment, or manufacture beyond primary hot-rolling." *Novosteel SA v. United States,* 128 F.Supp.2d 720, 729 (CIT 2001) (citing *Winter–Wolff, Inc. v. United States,* 996 F.Supp. 1258, 1265 (CIT 1998)).

## II

Commerce's conclusion as to whether the products were "further worked" was far from clear. In the *Preliminary Scope Determination,* Commerce stated that "it is not clear whether the Reiner Brach profile slabs qualify as flat-rolled products covered by the Plate Orders. To answer this question, we examined the *Diversified Products* criteria enumerated in section 351.225(k)(2)." *Preliminary Scope Determination Regarding Profile Slabs—Antidumping and Countervailing Duty Orders on Certain Cut–to–Length Carbon Steel Plate from Germany,* U.S. Department of Commerce Internal Memorandum from Roland MacDonald to Joseph Spetrini, at 5 (March 23, 1999) ("*Preliminary Scope Determination*"). However, in the *Final Scope Determination* under review, Commerce concluded that "record evidence indicates that Reiner Brach profile slabs are indeed further processed, and thus do not fall within the definition of excluded products at Note 1(ij) . . . ." *Final Scope Determination Regarding Profile Slabs—Antidumping and Countervailing Duty Orders on Certain Cut–to–Length Carbon Steel Plate from Germany,* U.S. Department of Commerce Internal Memorandum from Roland MacDonald to Joseph Spetrini, at 4 (May 18, 1999) ("*Final Scope Determination*").

Apart from evidence that Novosteel was able to manufacture its profile slabs within close flatness tolerances, the evidence of "further working" was (1) Reiner Brach's sales brochure, which explicitly stated that "[a] hydraulic press as well as a five roll flattening machine are employed to back up this guaranty" of "[f]latness within close tolerances;" and (2) ultrasonic testing which suggested that its profile slabs were sold as finished products. *See Final Scope Determination* at 7–8. At oral argument in this court, the government did not rely on the flatness tolerances as showing "further working" and conceded that the ultrasonic testing (item 2) itself did not constitute "further working." With respect to

---

**1.** Note 1(k) defined "flat-rolled" as "rolled products . . . that do not conform to the definition at [Note] 1(ij)." Note 1(ij) defined "semi-finished products" as products that "have not been further worked [other] than subjected to primary hot-rolling . . . ." In light of the parties' agreement, I do not reach the question of whether the use of the definition of "flat-rolled" provided in the notes is appropriate.

the hydraulic press and the five-roll flattening machine (item 1), Commerce urged at oral argument that these machines showed the "capab[ility]" to engage in "further working."

## III

There is no substantial evidence in this record to support a finding that the appellant's product was "further worked." The majority appears to agree, stating:

> In a sense, a short brochure might seem like a *slender reed* on which to base a scope determination, especially one in which the appellate record alone includes more than 1300 pages. After all, one might think that the government or the Defendant–Intervenors *could have had an expert* (or several experts) examine one of Reiner Brach's profile slabs and determine one way or the other whether the steel exhibited signs of additional treatment or processes beyond primary hot rolling. Or that *an expert could have examined other evidence,* like the Reiner Brach brochure, and concluded that the statements in that brochure showed that the steel profile slab was "flat-rolled" within the technical meaning of that term.

*Ante* at 1272 (emphases added).

To be sure, as I discuss below, there is evidence that the product *might have been* "further worked," but that is not evidence of "further working." It is well established that speculation does not constitute "substantial evidence." As the Supreme Court noted in *Bowen v. American Hospital Ass'n:* "Agency deference has not come so far" that agency action is upheld "whenever it is possible to 'conceive a basis' for administrative action." 476 U.S. 610, 626, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986); *see also SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("The Commission's action cannot

be upheld merely because findings might have been made and considerations disclosed which would justify its order.... There must be such a responsible finding."). Under these circumstances, Commerce's conclusion that there was evidence of "further working" necessarily falls.

## IV

The majority appears to sustain Commerce on a ground not articulated by the agency—that the uncertainty as to "further working" renders the Plate Orders ambiguous. Quite apart from its apparent failure to abide by the *Chenery* rule, barring affirmance of agency decisions based on new arguments by counsel, 318 U.S. at 95, 63 S.Ct. 454, the majority's theory is, I think, incorrect. The majority states that "the Commerce Department and the Court of International Trade ... considered the brochure's statements for the limited purpose of determining whether the Orders unambiguously included or excluded the Reiner Brach profile slab ...." *Ante* at 1272–73. To support its conclusion that Commerce properly found an ambiguity, the majority cites evidence of possible "further working" by noting that "Reiner Brach *could possibly* have had additional treatment done on its profile slabs so as to have that steel product 'flat-rolled,' *i.e.,* 'further worked.'" *Id.* at 1272 (emphasis added). The majority further states that Commerce

> could read these other statements [in the brochure regarding the market for the profile slabs and the ultrasonic testing] to confirm that Reiner Brach *may indeed have undertaken* processes to help refine and test its steel .... This inference is further bolstered by the admission that Novosteel apparently made in its brief about Reiner Brach having its profile slab produced at a "two high reversing mill," a mill that is *capable of*

producing the type of steel covered by the Plate Orders.

*Id.* at 1272 (emphases added).

The *possibility* that these products were "further worked" does not render the Plate Orders ambiguous. In other words, the existence of an inadequate record concerning the characteristics of these products does not create an ambiguity as to the scope of the Plate Orders. We should not approve an approach under which Commerce can simply fail to investigate, and then declare a resulting ambiguity as to whether a product is within the scope of an order. In light of this skeletal record, the appropriate recourse is to remand this case to Commerce for a determination of the "further working" issue on an adequate record.

For the foregoing reasons, I respectfully dissent in part.